### UNITED STATES v. SPRAGUE et al.

(District Court, E. D. New York. July 31, 1913.)

1. FOOD (§ 12\*)—FOOD AND DRUGS ACT—ADULTERATION—SHIPMENT OF ADULTERATED FOOD—"FILTHY."

Oysters, although shipped unopened as taken from the water, may come within the prohibition of Food and Drugs Act, June 30, 1906, c. 3915, § 2, 34 Stat. 768 (U. S. Comp. St. Supp. 1911, p. 1354), where by reason of the condition of the waters in which they are grown they contain harmful bacteria, which renders them "filthy, decomposed, or putrid," and therefore adulterated within section 7, subd. 6, of the act.

[Ed. Note.—For other cases, see Food, Dec. Dig. § 12.\*]

---

2. FOOD (§ 12*)—SHIPMENT OF ADULTERATED FOOD—ELEMENTS OF OFFENSE—KNOWLEDGE AND INTENT.

Food and Drugs Act June 30, 1906, c. 3915, § 2, 34 Stat. 768 (U. S. Comp. St. Supp. 1911, p. 1354), which provides that the shipment or delivery for shipment in interstate commerce of any article of food or drugs which is adulterated or misbranded shall constitute a misdemeanor, does not make the knowledge or intent of the shipper an essential element of the offense.

[Ed. Note.—For other cases, see Food, Dec. Dig. § 12.*]

3. FOOD (§ 5*)—"ADULTERATION."

The ordinary use of the word "adulteration" implies an actual addition to the original substance, through human agency. But as used in Act June 30, 1906, c. 3915, § 7, subd. 6, 34 Stats. 769 (U. S. Comp. St. Supp. 1911, p. 1357), known as the Pure Food and Drugs Act, the meaning is not restricted to an addition by the hand of man, and if the adulteration of filthy, decomposed, or putrid substance has been added by nature, and is contained in the article to be shipped, it is adulterated in the eyes of the law.

[Ed. Note.—For other cases, see Food, Cent. Dig. § 1; Dec. Dig. § 5.*

For other definitions, see Words and Phrases, vol. 1, pp. 210–212.]

Criminal prosecution by the United States against Smith Sprague and George W. Doughty, for violation of the Food and Drugs Act. On motion to quash and demurrer to information. Overruled.

William J. Youngs, U. S. Atty., of Brooklyn (Samuel J. Reid, Jr., Asst. U. S. Atty., of New York City, of counsel), for the United States.

Davison & Underhill, of Brooklyn, for defendants.

CHATFIELD, District Judge. The defendants have been brought into court upon an information filed under Act June 30, 1906, c. 3915, 34 Stats. 768 (U. S. Comp. St. Supp. 1911, p. 1354), known as the Pure Food and Drugs Act. The precise charge is that the defendants, as copartners, shipped from Far Rockaway, N. Y., to the state of Pennsylvania, 10 barrels of oysters, upon the 12th day of October, 1911; that the oysters were "adulterated" in that they "consisted in part of filthy, decomposed, and putrid animal and vegetable substance," and that the oysters were an article of food, as distinguished from drugs, etc. The information is sufficient in its general form. The defendants have appeared in court, and interposed a motion to quash the information upon three grounds: (1) That the information does not charge the defendants with knowingly and willfully doing any of the things mentioned; (2) that the law above referred to does not cover, and was not intended to cover the shipment of oysters, and that a shipment of unopened oysters, in their natural condition, after removal from the water, is not within the language or intent of the sections relating to adulteration; (3) that the papers upon which the information was issued, and which are filed with the information, do not show the oysters to have been, in whole or in part, of a filthy, decomposed, or putrid animal or vegetable substance. The defendants have also interposed a demurrer upon the same grounds above men-

tioned, alleging that the information does not state facts sufficient to constitute a crime.

It is apparent that some of these questions would be raised properly by demurrer rather than by motion to quash (for the alleged defects are claimed upon the allegations of the information, and argument thereon is based upon its language). The question with respect to the scope of the act, and the motion based upon the physical composition or analysis of the substance in question, can be raised by the motions. In support of the motion to quash, the defendants have relied upon facts which are matters of common knowledge and admitted by the United States Attorney, to the effect that the oysters in question were unopened when taken from the waters of a bay in this district by the shippers, and, without any treatment or manufacture, except that of gathering or packing for shipment, were transmitted in a living state. This presupposes that the muscular structure of the oyster has kept the shell closed, and that nothing has been added thereto, or could have been added thereto, except through the application of liquid. It is alleged and admitted that no liquid has been supplied beyond the ordinary water upon or in which the oysters live. In addition, the motion is based upon the allegations of the information that the adulteration complained of consists of bacteria, particularly the bacillus typhosus and other animal and vegetable bacilli, which were admittedly absorbed by the live oyster during its process of growth; that is to say, from the liquid which it consumed in its natural functions. The court will not attempt to differentiate between the points raised by demurrer and those raised upon the motion to quash, other than to state them as they are taken up in order.

[1] As to the objection that the oysters did not consist in whole or in part of filthy, decomposed, or putrefied animal or vegetable substance, no argument would be needed, if living bacilli had been knowingly introduced into an oyster by the defendants, and allowed to reproduce therein. It seems hardly open to argument that the words "filthy, decomposed, and putrefied" would be applicable to certain conditions resulting from the presence of living organisms; and in fact, from common knowledge of the present state of scientific research, the conditions of animal substance known as "filthy, decomposed, and putrefied" are caused by the presence of such living organisms. When we consider a specific bacillus such as that named, whether or not its presence might cause decomposition or putrefaction raises a question of fact that cannot be disposed of upon this motion, for the degree of decomposition of tissue might be so slight as to render the use of those words inapplicable, from the standpoint of a substance intended for food. But the language used in the statute is in the alternative, and in the information the words "filthy, decomposed, and putrid" are stated in conjunction. A substance containing bacilli liable to cause disease, to such an extent as to make it dangerous for food purposes, is certainly "filthy," under the meaning of that word as generally used, and especially since the result of investigation has shown that filth or dirtiness is dangerous through the germs which it contains, and not solely because of offense to the senses.

[3] The statute prohibits the *manufacture* of any article of food or drugs which is "adulterated or misbranded," and by section 7, subd. 6, the definition of the word "adulteration," for the purposes of the statute, is made to cover a substance consisting in whole or in part of a filthy, decomposed, or putrid animal or vegetable substance, or any portion of an animal unfit for food, whether manufactured or not. It may be assumed that oysters, while belonging to the animal kingdom, would not be classified as animals. But even if they be treated · as fish or mollusk, and assuming that the words "whether manufactured or not" relate only to the clause as to the "portion of an animal unfit for food," the indication is that the certain intent of Congress was to give full meaning to the definition of "adulteration" defined as "consisting in whole or in part of a filthy substance." The ordinary use of "adulteration" implies an actual addition to the original substance, through human agency. But the word as used in the section does not restrict this to addition by the hand of man, and if the adulteration of filthy, decomposed, or putrid substance has been added by nature, and is contained in the article to be shipped, it is adulterated in the eyes of the law.

[2] This brings us to the principal question in the case. The statute makes it unlawful to manufacture any article of food or drug which is adulterated or misbranded within the meaning of this act. If a person, through his servants, makes an article which is in fact adulterated, he is liable for the manufacture, within the jurisdiction of the act of Congress, even though he does not know that the Pure Food and Drugs Law is on the statute book, and does not know that the resultant condition of his process of manufacture has produced a substance which on analysis appears to be adulterated through containing decomposed animal matter. In the same way, he would be liable for a misbranding if the methods employed in his business caused the sending out of goods in violation of the statute. The law further makes any article of food or drugs which is adulterated or misbranded, within the meaning of the act, contraband; that is, the introduction of them into another state or territory is prohibited. Such goods cannot be transmitted by interstate commerce without rendering the goods subject to seizure and destruction, and under section 10 this of itself shows that the knowledge or intent of the party shipping is not a material element of the situation which is prohibited by the act of Congress. The law further provides that if any person shall ship or deliver for shipment, in unbroken packages or otherwise, an adulterated or misbranded article, or shall offer such for sale, he shall be guilty of a misdemeanor.

The information in this proceeding charges the defendants with having offered for shipment an article which must be held to be adulterated and to be plainly contraband under the law. They are bound by the fact that the law was in existence. They are bound by the fact that they knew that they were manufacturing for shipment, or were actually shipping by interstate commerce, certain packages of oysters, which would be contraband or subject to seizure if found to contain filthy or decomposed matter (that is, "adulterated") within the mean-

ing of the law. Congress has seen fit to impose a penalty for such a violation, and it is no defense to claim that the person causing the violation neither knew at the time that the goods were offensive, nor intended to violate the law. Hence an allegation that the defendants knew that the article was adulterated, at the time that they intentionally and willfully shipped it or caused it to be shipped, would apply only to cases where the adulteration had been placed in the goods by or with the knowledge of the shipper, or where an examination of the article had disclosed its presence. But Congress has gone much further, and in the exercise of its police power has imposed a penalty upon the sending of the deleterious or harmful substance, where the shipper is responsible for the act of sending, even though he may have nothing to do with the condition of the article sent, except as possession or ownership make him responsible. The use of interstate commerce or of means of shipping an article from one point to the other, like the manufacture of an article, or its adulteration with a substance by the person preparing it, is an act which, when alleged in an indictment, need be charged as "knowingly" committed only if the person charged has to be alleged to be in possession of and exercising his mental faculties. Such an allegation is not necessary where, as here, the word "ship" means "cause to be shipped." Where a person intentionally uses or has used means of transportation, under such conditions that he may unwittingly be liable to a fine, then, subject to constitutional limitations, the imposition of the fine for the specific act must be determined solely from the conditions under which the penalty would be imposed, and not from the intent or purpose of the one liable to the fine.

The defendants have cited a number of cases to show that criminal intent requires knowledge or conscious action on the part of the criminal. They argue that a charge in the language of the statute is not sufficient if the act alleged could be innocently done, unless guilty knowledge is present, from which intent would have to be inferred. But this statute compels liability, if the harmful act has occurred through a shipment personally made by the defendant, or for which he is in a business sense responsible as shipper. The extent of the responsibility is left to the court, when considering the amount of punishment. The determination of when the defendant should be held as the shipper of the contraband article is a matter of law, but the fault of indefiniteness, or of failure to set forth what is charged to be criminal, cannot be urged against the present information. The statutory requirements render the matter more definite, so far as limiting or defining the circumstances under which Congress intended that criminal responsibility should be placed upon an individual, and less latitude is given to those enforcing the law (with respect to everything except the amount of punishment) than if a determination as to the knowledge or information of the defendant were to be entered into.

The conclusion must be that if the person accused is responsible under the statute for the consequences of a shipment by interstate commerce, and if that responsibility carries with it a punishment for

violation of some regulation necessary for the safety of health, then the information will lie.

The demurrer will be overruled, and the motion to quash denied.