**KENOWER v. HOTELS STATLER CO.,**
**Inc., et al.**
**No. 8758.**

Circuit Court of Appeals, Sixth Circuit.
Jan. 9, 1942.

Victor H. Hampton, of Detroit, Mich. (Clark C. Coulter and Victor H. Hampton, both of Detroit, Mich., on the brief), for appellant.

Dean Alexander, of Detroit, Mich. (Alexander, McCaslin & Cholette and Clarence C. Donovan, all of Detroit, Mich., on the brief), for appellees.

Before HAMILTON, MARTIN, and McALLISTER, Circuit Judges.

McALLISTER, Circuit Judge.

John L. Kenower, appellant, herein referred to as plaintiff, brought suit against Hotels Statler Company, Inc., for damages alleged to have resulted from illness and typhoid fever, as the effect of eating clams infected with typhoid bacilli, which were served to him in the Hotel Statler in Detroit. Appellee, O'Neil and Hoffner, was joined, pursuant to Rule 14 of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, as a defendant, on pleadings filed by the original defendant, alleging that such third party was liable for damages under the allegations made by plaintiff.

On the trial, at the conclusion of plaintiff's case, the District Court directed a verdict of no cause of action on the ground that there was no evidence on which the jury could render a verdict against either of the defendants.

Plaintiff's declaration is based upon negligence and breach of warranty, specified separately in two counts. On review, it is contended that a prima facie case for breach of warranty was proved by plaintiff and that the court erred in directing a verdict.

In considering the appeal, two issues are presented: whether there was sufficient evidence that plaintiff's consumption of the food resulted in typhoid fever to require submission of the facts to the jury; and whether defendants are liable for breach of warranty.

From the evidence, it appears that on March 3, 1939, plaintiff, accompanied by a friend, had luncheon in the Hotel Statler, where he consumed the clams; that within an hour and a half, or two hours, thereafter, he suffered cramps, nausea and dysentery; that he called his doctor and was advised to take some paregoric, which he did, on the same day; that the cramps continued for a couple of days and plaintiff suffered from the dysentery and diarrhea up to the time of his serious illness, which occurred about three weeks after eating the clams. His physician had seen him in the meantime and had discussed the illness with him; and on March 23d, in response to plaintiff's call, he found him suffering acutely, accompanied with fever. Within the next few days the illness was diagnosed as typhoid fever. It appears that modern medical science has so greatly curbed the former ravages of this dangerous malady that today typhoid

660

fever is an uncommon and rare disease; but that in spite of its infrequent visitations, the consumption of shellfish is a common source of typhoid infection in the human being. Diarrhea is a very common symptom of typhoid infection. The incubation period of the disease, from the time of first infection, ranges from 3 to 27 days; and is commonly between 7 and 21 days.

▪ While the doctrine of res ipsa loquitur is not recognized in Michigan, we are of the opinion that, from the foregoing evidence, the jury could draw reasonable inferences that the cause of plaintiff's illness and typhoid fever resulted from the consumption of clams at the hotel on the day in question.

Plaintiff contends that he was entitled to go to the jury on a count of breach of an implied warranty that the clams were wholesome and fit for consumption. Defendant claims that under the law as declared by the courts of Michigan, an action for breach of warranty on the sale of food can be maintained only upon proof of negligence; and that, to sustain the action there must be shown a want of a high degree of care.

No negligence was shown in this case. It is impossible to ascertain whether clams are infected with typhoid bacilli, unless each clam is subjected to a bacteriological examination by microscope. The health of an infected clam is not affected by the bacilli. In all tests other than microscopic—such as striking the clams together to ascertain soundness—infected clams appear healthy. Obviously, it is impossible for producers or vendors of clams to know that they are not infected with typhoid. The most that can be done to insure that clams are fit for human consumption, without destroying the marketability of the product, is to use the highest degree of care to see that they grow in healthy beds and in uncontaminated water.

▪ On the part of defendants, it is contended that no cases of typhoid fever in Detroit have ever before been known to result from clams furnished by O'Neil and Hoffner during their many years of business; that no other typhoid cases resulted from clams sold to, or furnished by, the Hotel Statler at the time in question; that plaintiff's typhoid fever could have resulted from other sources of infection; that the highest degree of care was exercised by defendants; and that to hold defendants liable in this case would establish

a rule easily enabling dishonest persons to perpetrate frauds on purveyors of food, and mulct them in heavy damages. However persuasive these contentions be, the facts are for the jury; and decision of the legal questions in the controversy is to be controlled by Michigan authority if precedents are available. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487.

In the early case of Hoover et al. v. Peters, 18 Mich. 51, a vendor who sold carcasses of hogs, sued for the purchase price. Breach of warranty was interposed as a defense, it being claimed that the pork was purchased for use as food in defendant's lumber camps, and that it was unfit for consumption. Plaintiff had judgment, and on appeal, it was argued by appellee that cases which trench upon the maxim, caveat emptor, were unsound; that the vendor in the case was not a victualer and no better qualified to judge of the wholesomeness of the pork than the buyer; and that there was nothing about plaintiff's calling or experience upon which the public had a right to rely as a warranty of the soundness of his commodity. The judgment of the trial court was, however, reversed and Mr. Justice Campbell, speaking for the court, after observing that the circuit judge had instructed the jury that where a person, "as in this case, sells goods in open market, there is no such implied warranty [of soundness], and no liability for faults in the absence of deceit, fraud or special warranty," said:

"It seems to be settled by many authorities that no implied warranty of soundness arises where such articles are purchased by a dealer to sell again.

"Whether this rule arises from the fact that any injury from the use of the articles is likely to be remote and not readily traced out, or because, where his purpose in buying is merely speculative, one commodity is not to be distinguished from another in its incidents as merchandise, or what special reasons have led to it, cannot easily be determined. It stands as a recognized doctrine, whatever may have been its reasons.

"But where property is bought for a particular purpose, and only because of its supposed fitness for that, there are many cases in which a warranty is implied, unless the purchaser has seen fit to act upon his own responsibility and judgment. And where articles of food are bought for con-

sumption, and the vendor sells them for that express purpose, the consequences of unsoundness are so dangerous to health and life, and the failure of consideration is so complete, that we think the rule which has often been recognized, that such sales are warranted, is not only reasonable but essential to public safety. There may be sellers who are not much skilled, and there may be purchasers able to judge for themselves, but in sales of provisions the seller is generally so much better able than the buyer to judge of quality and condition, that if a general rule is to be adopted, it is safer to hold the vendor to a strict accountability than to throw the risk on the purchaser. The reason given by the New York authorities, in favor of health and personal safety, is much more satisfactory than the purely commercial considerations which take no account of these important interests. While the question has not perhaps been very often decided, the principle has been generally accepted among the legal writers, and we feel no disposition to recede from it. We have been pointed to no distinction between sales in one market or another, and can conceive of no special reason for regarding one sale for this purpose as differing in its incidents from any other. The doctrine seems to be that any purchase for domestic consumption is protected."

Application of the decision to the case before us is emphasized by the dissenting opinion in the cited case, in which it was said that, inasmuch as it did not appear that the vendor was a keeper of a meat market or butcher shop, and not bound or presumed to know whether the meat was fit for food, the maxim of caveat emptor should apply, for the reason that the plaintiff did not know anything more of the condition of the meat than the purchasers, who had the same opportunity to judge for themselves, and was under no obligation of ascertaining, at his peril, the condition of the pork.

In Copas v. Anglo-American Provision Co., 73 Mich. 541, 41 N.W. 690, where a butcher, who kept a meat market, had purchased hams from a meat packer and sued in assumpsit, complaining that they were unfit for food, it was held that there was an implied warranty that the meat was fit for food. In Cook v. Darling, 160 Mich. 475, 125 N.W. 411, 413, a case in assumpsit, it was said that where a party sells foodstuffs for consumption, "the consequences of unsoundness are so dangerous to health

and life and the failure of consideration so complete that, where there is not an express warranty, there is an implied warranty that the goods are fit for the purpose for which they were bought, and that articles of food are fit for consumption. In such cases the vendor is held to a strict accountability."

Defendants, however, without mention of the Hoover case, contend that the Michigan rule is that warranty in the sale of foodstuffs is only a warranty that the highest degree of care has been exercised by the vendor, and in support of their claim, cite as controlling authority the case of Hertzler v. Manshum, 228 Mich. 416, 200 N.W. 155, 156.

In the Hertzler case, plaintiff sued to recover damages resulting from the consumption of food made from flour which contained arsenate of lead. The suit was brought against the manufacturer of the flour, and the storekeeper who sold it. The declaration counted on implied warranty, violation of a statutory mandate, and negligence. The trial court submitted the case to the jury, only on the question of negligence; and a verdict was rendered for defendants.

On appeal, the judgment was reversed, and Mr. Justice Wiest, speaking for the court, referred to the numerous conflicting adjudications on the question of the liability of a manufacturer of foodstuffs to the ultimate consumer, and in declining to distinguish or enter upon a review of such cases, said: "We have before us a case of a foreign poisonous substance in flour, *and our opinion is confined to such a case.*" It was further pointed out that arsenate of lead was a poison, wholly foreign to flour; that it could not be the result of deterioration; that, unexplained, it evidenced negligence; and that even ordinary care ought to keep arsenate of lead out of flour. In addition, the court said that the law, "in a case like the one at bar," held the manufacturer for a breach of implied warranty, arising from foreign poisonous substances in the flour, which were there only by reason of a want of a high degree of care. "The implied warranty, so called, reaching from the manufacturer of foodstuffs to the ultimate purchaser for immediate consumption is in the nature of a representation that the highest degree of care has been exercised, and a breach of such duty inflicting personal injury is a wrong in the nature of a tort, and not a mere breach

of contract to be counted on in assumpsit. Except in name and to establish privity between the manufacturer and the ultimate consumer, it is the same thing as negligence. Plaintiff's case, in its last analysis, is bottomed on negligence." Read out of its context, the above excerpt might appear to lay down a general rule in all cases where it is sought to establish liability for breach of warranty in the sale or furnishing of foodstuffs; and the case is cited to this effect by counsel for the hotel company. But, in view of the express and definite limitation by the court of the application of its opinion to a case of a poison in flour, together with the recurrent reference to plaintiff's rights in the cited case, we cannot agree that the court laid down the rule that negligence is a necessary element of proof in all cases based on breach of warranty in the sale or furnishing of foodstuffs to a consumer, or that the warranty in the sale of foodstuffs for consumption is only a warranty that the highest degree of care has been exercised by the vendor. It will be readily observable that there is the added distinction in the case before us that it concerns no manufacturer of food, or manufactured food—a fact that emphasized the perspicacity of the court in the cited case in limiting its opinion strictly to the facts before it. Furthermore, it is to be remarked that the court in its opinion was, in fact, ruling in favor of the plaintiff therein, and that, in its discussion, it was directing its attention largely to the question of privity, in an assumpsit action, between a manufacturer and an ultimate consumer who purchased from a middleman, under the given facts. Under these circumstances, we decline to hold that the Hertzler case is controlling in the controversy before us, or that it qualified the plain language of Hoover v. Peters, or overruled that case.

In Smolenski v. Libby, McNiell & Libby, 280 Mich. 329, 273 N.W. 587, 588, cited by counsel for the hotel company, in a suit against a manufacturer for damages resulting from an explosion of canned goods, the court remarked that the case of Hertzler v. Mansum apparently nullified the distinction between a claim against a *manufacturer* in tort and one on implied warranty; but stated that that case arose out of a sale of flour which contained poison and that the opinion was confined to such a case. It was further pointed out that in a suit involving a sale of contaminated kerosene which had been used in a

stove and exploded, liability had been denied, and the court had refused to extend the rule set forth in the Hertzler case, saying: "In cases other than where an injurious or poisonous matter was patent in the food product, we have declined to permit a third person to recover from the manufacturer on the warranty unless it is shown that the manufacturer knew, or should have known, of the existence of such deleterious matter." It is to be remarked that the question with which the court was concerned in the above-mentioned case was the right of a third person to recover against a manufacturer, which is entirely different from the right of the plaintiff in this case to recover against the hotel company.

In Cheli v. Cudahy Bros. Co., 267 Mich. 690, 255 N.W. 414, 416, a case involving liability for the sale of raw pork containing trichinae, Mr. Justice Butzel, speaking for the court, observed that the doctrine of implied warranty, while often confused with that of negligence, rested upon another principle of law, and that because the two theories were often asserted in the same action, it had led to a confusion of reasoning. In holding that the defendant in that case was not liable for a breach of warranty, the court said that there was no showing of an implied warranty as to the quality or fitness of raw pork as food in an uncooked condition. "Comparatively speaking, only an infinitesimal amount of the pork sold is eaten raw. It seems to follow logically that it is unfair to impose *the liability of an insurer* upon the meat packer through the implication of a warranty that pork is fit for human consumption in a raw state. This is especially true in view of the fact that the danger of infection can be reduced almost to the vanishing point by ordinary cooking methods. Fresh pork is not ordinarily intended to be eaten raw. *The warranty should be applied only to food used in the usual, rather than in the unusual and improper, manner."*

■ From the above, it is implicit that the liability of an insurer results from breach of warranty in the case of food, which is used in the usual manner by the consumer.

■ We are of the opinion that under the authority of Hoover v. Peters, supra, defendant hotel company would be liable on breach of warranty without proof of negligence, if it were found that it had caused plaintiff to be served infected clams.

from which his illness resulted. While the authority on which our conclusion is rested did not involve the serving of food to a person for immediate consumption on the premises, we feel that the reasoning of the court on the question of liability in the Hoover case is even more persuasive and applicable, where food is served to a patron of a hotel or restaurant; and since the notable opinion of Mr. Justice Stephens, in Cushing v. Rodman, 65 App. D.C. 258, 82 F.2d 864, 104 A.L.R. 1023, nothing can be added to supplement the principles and reasons for imposing liability without proof of negligence, for breach of warranty in the sale of food to a consumer on the premises.

Similar considerations are applicable to the third party defendant in this case. It is contended that among dealers the maxim of caveat emptor governs. But we do not agree that the hotel company was a dealer in provisions. It did not purchase the food as a dealer for resale. In buying the clams, the hotel company, certainly by implication, made known to its vendor the particular purpose for which they were required, namely, to be served as food in its dining rooms. Further, it must be considered that the hotel company relied on the seller's skill and judgment in purchasing the clams; and the fact that "cherrystone" clams were ordered, would seem to give rise to no valid contention that the hotel company relied upon its own judgment in selecting clams. Apparently, "cherrystone," when used with reference to clams, is descriptive of the type of clam. The manager of O'Neil and Hoffner testified: "There are the cherrystone and littleneck, and quahog clams. * * * Cherrystones are hard shell. There is another type known as the soft shell." Cherrystone is not a trade name.

Under the provisions of Sec. 9454, Comp.Laws of Mich. 1929 (Sec. 15, Uniform Sales Act), O'Neil and Hoffner would be liable to the hotel company for resultant damages if it were proved that the clams were infected when they were delivered to the hotel.

It is contended by plaintiff that the trial court improperly excluded testimony of a physician that, in his opinion, the consumption of the clams caused plaintiff's illness. Contrary to certain language used in earlier decisions, the Michigan rule now is that an expert medical witness invades the province of the jury when he testifies that, in his opinion, a result was, in fact, occasioned by a certain cause. He can testify that it might or could cause the condition, but not that, in his opinion, it actually did. DeHaan v. Winter, 258 Mich. 293, 241 N.W. 923; DeGroot v. Winter, 261 Mich. 660, 247 N.W. 69.

The judgment is reversed, and the case remanded to the District Court for a new trial.