RUTH PARKER, as Administratrix of the Estate of ERNEST PARKER, Deceased, Appellant, *v.* STATE OF NEW YORK, Respondent. (Claim No. 29907.)

Third Department, May 7, 1952.

*William A. Hyman* and *Harold W. Hayman* for appellant.

*Nathaniel L. Goldstein, Attorney-General (Wendell P. Brown, Solicitor-General,* and *Henry S. Manley* of counsel), for respondent.

BERGAN, J. Following the close of the last war quantities of dried blood plasma which had been collected from donors by the American Red Cross for the armed services were declared surplus property by the Government and turned back to the Red Cross to distribute for charitable purposes under the authority of a Federal statute.

The dried plasma had been stored in 500 c.c. containers. This quantity of plasma in each container had been processed from the whole blood of from ten to fifty different donors, and was thus known as " pooled plasma ".

The Red Cross requested the various States to undertake the free distribution of the plasma to hospitals for public use and the Health Department of the State of New York undertook the task of distribution within the State. Through the local agency of the Red Cross in Westchester County some of it was sent by the State in 1947 and 1948 to the Northern Westchester Hospital at Mt. Kisco.

It was known to the medical profession from the experience that had been gained with whole blood transfusions and with transfusions derived from dried blood plasma that there was some risk of transmitting virus diseases, especially a form of serum jaundice, and that this risk was greater in the case of pooled dried plasma because the virus of one infected donor would run through the rest of the plasma with which it was in contact in the same container.

Nevertheless there were circumstances when sound medical judgment indicated the use of pooled dried plasma. There are varied expressions in the record before us as to the risk involved in the use of this type of plasma and the limitations of its use. A good statement is contained in the report of the Committee on Blood and Blood Derivatives of the American Red Cross, copies of which were sent to all State health officers in August, 1947, and which was published in the Journal of the American Medical Association, November 15, 1947.

The conclusion of this statement, on which appellant places heavy emphasis here, is that all practicing physicians '' should be reminded '' of the '' potential risk '' in the administration of pooled plasma, and '' urged to restrict its use '' to those instances, '' chiefly serious emergencies, when its use is clearly indicated and when safer agents such as whole blood or serum albumin are not available.''

On the morning of November 21, 1948, the claimant's husband was found unconscious along a road. He was picked up by a passerby and taken to the Northern Westchester Hospital. He had a cerebral concussion and was in shock and in critical condition. A physician at the hospital who undertook his treatment prescribed a transfusion of blood plasma.

Plasma which the Red Cross had received from the Government and which the New York Health Department had distributed for the Red Cross was used for this purpose. The patient recovered from the acute effects of the concussion and was discharged from the hospital as improved after eight days.

A little over two months later he became ill from a form of serum jaundice and died on February 12, 1949. The Court of Claims has found the jaundice infection and death due to transmission of the virus by the transfusion derived from the pooled plasma, but has granted judgment dismissing the claim on the ground the State thereby incurred no tort liability.

The State in undertaking to distribute the plasma to hospitals for the Red Cross had a right to expect two things: (a) that the hospitals would be guided by the judgment of the medical profession in the circumstances indicating the use of the plasma; (b) that the profession would use an accepted standard of professional judgment in prescribing its use.

If a physician prescribed the serum mistakenly or by an erroneous professional judgment the legal responsibility for such an error could not be brought home to the State under any admissible theory of tort liability merely because it had acted for the American Red Cross as an agent of distribution.

There is, moreover, nothing in this record on which the Court of Claims would be compelled to find that the physician who undertook the treatment of the claimant's husband was mistaken in his professional judgment to use pooled dry plasma. The record suggests, rather, a situation in which any physician would be required to weigh the gravity of the shock and the need for immediate remedial treatment against the risk of virus infection from pooled plasma.

The record demonstrates good professional opinion that there are circumstances in which careful medical judgment would regard the immediate institution of shock treatment as outweighing greatly the mathematical possibility of virus infection.

The weight of medical opinion in the record is that " serious emergencies " when safer agents are " not available " would justify the use of the plasma. The Court of Claims was of opinion that what is " available " in a serious emergency is a matter of time and judgment and we think the record here fully sustains this view.

There is proof that there were other and possibly " safer " types of transfusion material in the hospital, but the record would sustain a finding that the plasma could more quickly be brought into use, when the hour of admission of the patient to the hospital and the need for preliminary blood tests, requiring the availability of both time and technicians, are kept in mind.

The claimant did not call the physician who made the medical decision to use the plasma. We must assume from this record that his course of treatment was based on sound medical judgment. Certainly the State would incur no tort liability if the physician who treated the patient had acted with that kind of medical judgment.

Even if he had acted mistakenly, or had made a wrong decision, the State would not be responsible unless in the exercise of reasonable care it could be required to foresee such a result. The State was bound to know that the use of this type of plasma involved some risk, but with that knowledge it also knew that its use was justifiable when the risk involved ought, in good medical judgment, to be taken.

It had a right to expect that the profession would use an agency of limited medical usefulness under limited conditions. The level of expectation of danger imposed on the State did not rise above that which would be required of a reasonably well-informed medical officer in carrying out the distribution program of the Red Cross, and the State could rest safely in the expectation that the plasma would be used in a recognized hospital only under competent professional prescription. We are of opinion that the State's liability has not been demonstrated.

The judgment of the Court of Claims should be affirmed, without costs.

FOSTER, P. J., HEFFERNAN, BREWSTER and COON, JJ., concur.

Judgment affirmed, without costs. [See *post*, p. 901.]