DOROTHEA G. HIDY, as Administratrix of the Estate of GEORGE A. HIDY, Deceased, Claimant, *v.* STATE OF NEW YORK, Defendant. (Claim No. 30530.)

Court of Claims, January 19, 1955.

CLAIM against State for wrongful death and for conscious pain and suffering.

*Salem G. Mansour* for claimant.

*Nathaniel L. Goldstein, Attorney-General (Donald C. Glenn* of counsel), for defendant.

RYAN, J. This suit is brought to recover damages for the conscious pain and suffering and for the death of George Arnold Hidy, a victim of homologous serum hepatitis, an infection which followed the administration to him of 500cc of unirradiated war-surplus pooled blood plasma. Hidy entered Niagara Falls Memorial Hospital on February 17, 1949, at 3:30 P.M. for the purpose of an orthopedic operation consisting of a bone graft on the cervical spine. The operation was begun at 8:20 A.M. on February 18th. During the course of the operation the injection of the plasma was given. Hidy recovered from the operation and was up and about when on May 17th he became violently ill. He died on May 23, 1949. The elapsed period of three months between the administration of the plasma and the death of the patient conforms to medical observation, experience and report. On February 18, 1949, there was available at the Niagara Falls Memorial Hospital an adequate blood bank, an adequate supply of universal " O " type blood and also a supply of irradiated commercial plasma. However, although Hidy was in the hospital for nearly fifteen hours prior to his operation, his blood was not typed or cross matched in preparation for the possible need of a blood transfusion during surgery.

The war-surplus pooled plasma administered to Hidy had reached Niagara Falls Memorial Hospital through distribution by the State of New York Department of Health pursuant to

the authority of the Surplus Property Act of 1944 (U. S. Code, tit. 50, Appendix, § 1620, subd. [f]) and of chapter 279 of the Laws of 1945. (Public Health Law, § 20-i now § 3100, L. 1953, ch. 879.) There were 84 units so delivered to the Niagara Falls Hospital in 1946, 224 units in 1947, and 348 units in 1948. At least as early as August, 1947, the report of the committee on blood and blood derivatives of the American Red Cross had been sent to New York's Department of Health. This report was also published in the *Journal of the American Medical Association* on November 15, 1947. It warned that all practicing physicians should be reminded of the potential risk in the administration of pooled plasma and urged that its use be restricted to those instances, chiefly emergencies, when its use is clearly indicated and when safer ingredients such as whole blood or serum-albumin are not available. By April 1, 1949, the National Health Council made irradiation of plasma compulsory.

This is not the first instance of suit against the State of New York to recover damages for death consequent upon its undertaking of the distribution of pooled war-surplus plasma. Our conclusion of its nonliability in a particular case has been upheld on appeal. (*Parker* v. *State of New York*, 201 Misc. 416, affd. 280 App. Div. 157, motion for reargument or in the alternative leave to appeal to Court of Appeals denied 280 App. Div. 901, motion for leave to appeal denied 304 N. Y. 989.)

However, each case must be determined upon its own facts and we find distinctions herein which must be noted. To begin with Parker was admitted to a hospital at 2:45 in the morning having been found unconscious by a roadside in a state of shock following a concussion received in an automobile accident. Factually the case was decided on the element of emergency. Judge SYLVESTER said (*Parker* v. *State of New York, supra,* p. 420): " The vital importance of the time element lies in the fact that shock induces a failure of circulation and an inadequate supply of blood to the brain, heart and other vital organs so that if circulation is not promptly re-established, the patient dies. The attending physician must therefore balance the risk incident to the immediate use of plasma against the possibility of death due to shock while awaiting the availability of safer whole blood properly selected or ' O ' blood with Witebsky's Solution."

And he concluded: " Clearly, the State was not at fault because the physician in the Parker case decided, in his judgment, to administer plasma."

Mr. Justice BERGAN, writing for affirmance by a unanimous court observed that the record in the *Parker* case (p. 160) fully

sustained the trial court's view: " that what is ' available ' in a serious emergency is a matter of time and judgment".

But here the situation is quite different. As we have already pointed out there was ample time between Hidy's admission to the hospital and the scheduled hour of his operation for preparations to have been made for the use of a safe and compatible blood product should necessity for transfusions or infusions arise. There was no emergency. Although, as in the *Parker* case, the physician who made the medical decision to use the plasma was not called to testify, we will not say, upon this different and distinguishable record, that sound medical judgment justified the inherent risk. However, neither the hospital, which ordinarily would not be liable for the physician's acts (*Schloendorff* v. *Society of N. Y. Hosp.*, 211 N. Y. 125; *Necolayff* v. *Genesee Hosp.*, 270 App. Div. 648, affd. 296 N. Y. 936), nor the physician himself is a defendant herein.

Wherein lies the responsibility of the State of New York? Arguments advanced herein that the State was remiss in failing to affix a warning label to the plasma container and that it freely distributed a dangerous substance without controlling its use were likewise invoked in the *Parker* case and were set at rest by Judge SYLVESTER. Liability on the theory of breach of an implied warranty of fitness was only the other day rejected by the Court of Appeals, and that in the case of a patient who did not get his transfusion free but who paid for the blood utilized in it. (*Perlmutter* v. *Beth David Hosp.*, 308 N. Y. 100, revg. 283 App. Div. 789.) Nor do we believe it was incumbent upon the State's Department of Health to circularize the members of the medical profession with copies of reports of studies of the use of plasma and the incidence of serum jaundice, and of the commentaries of specialists. All these were available to practitioners through the media of professional journals, such as *Health News*, the *New York State Journal of Medicine*, and the *Journal of the American Medical Association* in which publications various articles on the subject were printed in 1946, and throughout 1947, and are in evidence in this case.

The further argument is made that the State's Department of Health should have known, or at least should have foreseen, that the plasma was being used generally and unrestrictedly, that its use was not being confined to cases of emergency, by reason of its own statistical records which showed great increases in the quantities demanded and delivered, not only with respect to the institution herein involved but generally with respect to hospitals throughout the State. Assume that

this is so what should the State have done? The one complete and effective control would have been to cease distribution of the plasma and call in all unused quantities. This course, unless followed throughout the State, would have been discriminatory. If universally adopted it might have denied aid in areas where the plasma was needed for want of other materials and in cases where its use would have been justified. It must be borne in mind that the State was a mere distributor, that the Niagara Falls Memorial Hospital was not its agent and that there was no relation between the physician and the State calling for the application of *respondeat superior*.

Searching for a causal connection between the act of distribution of the plasma and the administration of it to Hidy we recall the case of *Slavin* v. *State of New York* (249 App. Div. 72), which has always seemed to us the extreme in the application of the doctrine that perceivable risk defines the duty to be obeyed. In the *Slavin* case an alarm had been transmitted over the State police teletype system for the arrest of armed robbers but the cancellation message, reporting that they had been apprehended, had not been relayed to all police stations which had received the alarm. Slavin was shot, not by a State employee but by a city policeman in plain clothes. In holding the State responsible for its employee's failure to transmit the cancellation message, Mr. Justice Bliss found the flow from cause to effect uninterrupted and said, referring to claimant's intestate and his companion: " It might well have been anticipated that harm in some form would come to these innocent men." (P. 75.)

Here, if there was negligence in the State Department's failure to stop distribution and to call in the unused plasma — and we do not so find — there was then the independent intervening agency of the physician, presumably competent, who directed the administration of the plasma to Hidy. Claimant's counsel argues that the State, by reason of the increase in its distribution, must have known that the hospitals and the medical profession itself were, in actual practice, completely disregarding the restrictions prescribed by sound medical judgment upon the use of the pooled plasma. But was it the duty of the State Department of Health to interpose itself as monitor to the medical profession? At what point in its paternalistic course must the State tap the doctor on the shoulder and say " No farther "? As pointed out by Mr. Justice Bergan in the *Parker* case (280 App. Div. 157, 160, *supra*) and to again quote him: " Even if he had acted mistakenly, or had made a wrong decision, the State

would not be responsible unless in the exercise of reasonable care it could be required to foresee such a result."

After full consideration of all of these arguments we believe that again, " the State's liability has not been demonstrated ", and that this claim must be dismissed.

We have marked the several requests to find facts and conclusions of law submitted by counsel for the claimant and by the Attorney-General, adopting them or refusing to adopt them as indicated. As so marked, they, together with this opinion, constitute the decision of the court.