MERCK & COMPANY, Inc., Appellant,

v.

Floyd E. KIDD, Appellee.

No. 12918.

United States Court of Appeals
Sixth Circuit.

April 6, 1957.

Hayward H. Coburn, Philadelphia, Pa. (Joseph A. McAfee, Egerton, McAfee, Armistead & Davis, Knoxville, Tenn., Ernest L. Nagy, Drinker, Biddle & Reath, Philadelphia, Pa., on the brief), for appellant.

Ben F. McAuley, of Poore, Cox, Baker & McAuley, Knoxville, Tenn. (Frank H. Marsh, Jr., of Cheek, Taylor & Marsh, Knoxville, Tenn., on the brief), for appellee.

Before McALLISTER, MILLER and STEWART, Circuit Judges.

STEWART, Circuit Judge.

This is an appeal from a judgment entered upon a jury verdict for personal injuries in a diversity of citizenship case. The underlying facts are no longer in dispute.

The appellee was injured when his leg came in contact with a power saw. His injuries were severe, consisting of a large cut in his right thigh extending down to the bone. He was taken in a state of shock to a hospital in Knoxville, where his wife signed on his behalf a consent to any medical or surgical procedure the surgeon or physician in charge of his case might deem necessary. Because of the appellee's condition the hospital's resident surgeon administered a quantity of blood plasma before performing emergency surgery. The plasma had been manufactured by the appellant.

The appellee made a normal recovery and was discharged from the hospital about a week later. Some two months thereafter, he became afflicted with jaundice, and his condition was diagnosed as probably homologous serum hepatitis. He was confined to a hospital for several days and to his home during a long period of convalescence. The jury determined that this illness had been caused by the blood plasma administered to him upon the occasion of his leg injury, and the appellant does not now dispute that finding.

The plasma in question is a dried powder which by the addition of sterile water is quickly reconstituted into liquid blood plasma which can then be administered as a substitute for whole blood. It has marked advantages over whole blood, particularly for emergency use. Among these advantages are its stability, and the fact that it can be administered safely without first determining the blood type of the recipient.

The manufacture of blood plasma is regulated by the United States Department of Health, Education and Welfare under the Virus, Serum and Toxin Act, 42 U.S.C.A. § 262. The appellant was licensed under that statute to manufac-

ture the plasma in question, and it was manufactured in conformity with the administrative standards promulgated thereunder.

The manufacturing process involves pooling the blood from a substantial number of donors and then processing the pooled blood so as to form the dried plasma. If the blood from a single donor contains the virus of serum hepatitis, there is a risk that a patient to whom the product is later administered may develop the disease. Despite every effort to screen the donors, it is recognized that the possibility that the hepatitis virus may be present in dried plasma cannot be completely obviated. Moreover, if the virus is present, it cannot be discovered by microscopic examination or by any other test known to medical science. It cannot be removed nor destroyed by any known method which does not also destroy the utility of the plasma. As counsel for the appellee concedes, "The only known way to determine whether the virus is present in any given lot of plasma is to give the plasma to a human volunteer and await developments."

Licensed manufacturers of plasma are required by federal authorities to include in the labelling of the product a warning calling the attention of physicians to the possibility that a patient to whom the product is administered will develop serum hepatitis. Such a warning accompanied the package of plasma which was administered to the appellant. The surgeon who administered it stated that he had read that warning or a similar one, and that the possibility of a patient contracting hepatitis or jaundice from blood plasma was well known to him and to the medical profession generally. He referred to it as "a so-called calculated risk."

The appellee's original complaint contained allegations of actual negligence in the manufacture of the plasma and of breach of implied warranty of merchantable quality and fitness for use. In the amended complaint, however, these claims were abandoned, and the appellee's cause of action was bottomed specifically and exclusively upon the theory that the appellant had violated the Tennessee Food, Drug and Cosmetic Act in selling or delivering an adulterated drug as defined by that statute, and that the violation amounted to negligence *per se.* Tenn.Code Anno. §§ 52–101 through 52–124. This case, therefore, does not involve any question of the appellant's negligence in fact. Cf. Parker v. State, 3rd Dept.1952, 280 App.Div. 157, 112 N.Y.S.2d 695. Neither does it involve a claimed breach of warranty. Cf. Perlmutter v. Beth David Hospital, 1954, 308 N.Y. 100, 123 N.E.2d 792; Kenower v. Hotels Statler Co., 6 Cir., 1942, 124 F. 2d 658.

The Tennessee Food, Drug and Cosmetic Act is patterned upon the Federal Food, Drug, and Cosmetic Act, 21 U.S. C.A. § 301 et seq. It prohibits, among other things, the sale or delivery within that state of any food, drug, device, or cosmetic that is "adulterated." § 52–103(a), Tenn.Code Anno. The plasma unquestionably was a "drug" as defined by the statute. § 52–102(d), Tenn.Code Anno. A drug is "adulterated" under the statute "if it consists in whole or in part of any filthy, putrid, or decomposed substance." § 52–115, Tenn.Code Anno.

The appellee's theory was that the plasma in question was adulterated because the virus which it contained was a filthy substance. The district court admitted the testimony of several physicians upon the question of whether the virus was "filthy." The effect of this evidence was inconclusive, except to establish that there is no medical or scientific definition of the term. The court submitted the question to the jury for determination. It is the appellant's claim that this was a question of law to be determined by the court, and that as a matter of law the hepatitis virus is not a "filthy" substance within the meaning of the statute.

■ There have been no adjudications by the courts of Tennessee involving the meaning of these provisions of the statute. Both parties to this appeal, however, agree that since the Tennessee law

is patterned upon the Federal Act, resort may properly be had to federal court decisions construing the latter statute. The meaning of "filthy" is the subject of a number of decisions by the federal courts in cases involving food, and the courts have apparently been unanimous in holding that the term is not synonymous with "injurious to health" or "unfit for food." Salamonie Packing Co. v. United States, 8 Cir., 1948, 165 F.2d 205, 206, certiorari denied 333 U.S. 863, 68 S.Ct. 744, 92 L.Ed. 1142; United States v. 1851 Cartons, etc., 10 Cir., 1945, 146 F.2d 760; see United States v. 449 Cases, etc., 2 Cir., 1954, 212 F. 2d 567. The fact that hepatitis virus is injurious is thus clearly irrelevant to the question of whether or not it is filthy. Similarly, since filthy is not synonymous with "infected" or "diseased," the trichinosis cases arising under state food and drug laws, relied upon by the appellee, shed no light upon the question in issue. See Troietto v. G. H. Hammond Co., 6 Cir., 1940, 110 F.2d 135; Leonardi v. A. Habermann Provision Co., 1944, 143 Ohio St. 623, 56 N.E.2d 232.

In this connection, the substantial difference between the statutory definition of an adulterated food and that of an adulterated drug is worth pointing out. If the hepatitis virus were present in food, the food would clearly be adulterated under the Tennessee statute. The virus is "a deleterious substance" which may render food "injurious to health." Tenn.Code Anno. § 52–110(a) (1). The omission of a like provision in the statutory definition of an adulterated drug was obviously not mere inadvertence. Tenn.Code Anno. § 52–115. The statute tacitly recognizes that many valuable drugs can or may contain substances of potential injury to health. Their use often involves the acceptance of a calculated risk by the physician who prescribes them. The physician in the present case concededly accepted just such a risk.

The federal courts have held that the word "filthy" is intended to be given its ordinary meaning. United States v. Swift & Co., D.C.M.D.Ga.1943, 53 F. Supp. 1018, 1020; United States v. 44 Cases, etc., D.C.E.D.Ill.1951, 101 F.Supp. 658, 664. The term should not be confined to any supposed scientific or medical definition, and, by the same token, it should not be expanded beyond its accepted connotation in ordinary English speech. The substances under consideration in the cited cases were all filthy within the ordinary meaning of the word: fly eggs, maggots, and rodent hair. The federal statute has been applied to a filthy substance imperceptible to the consumer, when the substance involved was clearly filthy within the ordinary meaning of the word (worm fragments and worm excreta), and where its presence could have been prevented by proper methods of manufacture. United States v. 133 Cases of Tomato Paste, D.C.E.D.Pa.1938, 22 F.Supp. 515.

The federal decision which comes closest to supporting the meaning which the appellee would ascribe to the term "filthy" is United States v. Sprague, D.C.S.D.N.Y.1913, 208 F. 419. That was a case decided under the Federal Pure Food and Drug Act of 1906, 34 Stat. 768. The court held that bacteria, particularly the *Bacillus typhosus,* which had been absorbed by live oysters during their process of growth, rendered them filthy, "especially since the result of investigation has shown that filth or dirtiness is dangerous through the germs which it contains, and not solely because of offense to the senses." 208 F. 421. That decision is differentiable for the reason that the bacillus there involved is microscopically detectible, and, as the appellant suggests, perhaps also because the typhoid bacillus was transmitted to the oysters in human sewage and other filth.[1]

1. Under the present statute the oysters would be adulterated by reason of containing a "deleterious substance" rendering them "injurious to health." 21 U.S.

C.A. § 342(a) (1). See discussion above as to difference in treatment of foods and drugs in this respect.

Ascribing to words their ordinary meaning, as exemplified by the cases cited, we agree with the appellant that a virus which cannot be seen even with the most powerful microscope, which cannot be described, and the presence of which cannot be known at all except for its ultimate result, is not a filthy substance within the intendment of the statute. For this reason we hold that the district court was in error in failing to direct a verdict for the appellant. This conclusion makes it unnecessary to consider the question of assumption of risk and the effect of the independent intervening act of the physician, as well as other questions raised by the appellant.

The judgment is set aside, and the case is remanded with directions to enter a judgment for the appellant.

McALLISTER, Circuit Judge (dissenting).

I regret that I am unable to concur in Judge STEWART's excellent opinion in this case.

The plasma was a drug. If it contained any filthy substance, it was adulterated, and its sale was prohibited under the Tennessee statute, as is so clearly set forth in the majority opinion. Typhoid bacilli, absorbed by live oysters, render them filthy. United States v. Sprague, D.C., 208 F. 419, cited in the majority opinion. In the similar case of clams, it is impossible to ascertain whether they are infected with typhoid bacilli, unless each clam is subjected to a bacteriological examination by microscope; and it is obviously impossible for producers or vendors to know that they are not infected with typhoid. Kenower v. Hotels Statler Co., 6 Cir., 124 F.2d 658, 660.

The fact that a substance, contained in a drug, cannot be perceived by a microscope, would seem to have no bearing upon whether it is a filthy substance. Before microscopes, typhoid bacilli, absorbed by oysters, would render them filthy. In the same way, the virus of serum hepatitis contained in plasma renders it filthy, even though it cannot be seen by a microscope; and I would consider this to be the case as a matter of law. Appellee assumed no risk.

In my view, the judgment should be affirmed.