BerNai® Ryan, P. J.
The facts pleaded in this case have already been reported. (Gielskie v. State of New York, 3 Misc 2d 578 [1956].) Therein my distinguished colleague decided that they stated a cause of action. The facts proved upon the trial of this case are in substantial agreement -with those pleaded. It becomes my task to decide whether or not they establish a cause of action.
The State of New York has been sued in tort for negligence in the preparation, publication, revision and distribution of instructions known as Form LR 36-6, 5-28-54, which is Exhibit 4 herein. The particular paragraph of the circular which accompanied the package of tetanus antitoxin has been quoted in full in the previous report. (3 Misc 2d 578, 581, supra.) Doctor Kearney, who administered the tetanus antitoxin to the claimant, injected it intraspinously for therapeutic purposes.
The State of New York defends on three particular grounds: 1. That the intervening act of Doctor Kearney, acting as a practicing physician and exercising his judgment as such, was the proximate cause of the claimant’s injury. 2. That the individual reaction, or idiosyncrasy, of this particular patient was unusual, indeed phenomenal. 3. That the diagnosis of tetanus was incorrect. Finally, the defense is, generally, that there were in 1954 and are now two schools of thought in the medical profession on the merits, or wisdom, if you will, of intraspinous administration of tetanus antitoxin.
Let us dispose of the last argument in first order. It appears that the instructions on Form LR 36-6, set forth on the reprint issued May 28,1954 are in the exact language of the instructions on the circular issued in 1941, except that the quoted paragraph on the 1941 circular was entitled, “ Therapeutic Dose,” instead of “ Therapeutic Treatment.” There is in the record before us a preponderance of evidence to support a finding that, in the elapsed number of years, medical opinion had changed and that by 1954 the great weight thereof condemned the intraspinous administration of tetanus antitoxin for therapeutic purposes. We so hold.
*510 In a very recent case it was held that a statute which directs the State Commission of Correction to “ protect and preserve the health of the inmates ” of a prison, “ requires the employment and rendition of commonly and authoritatively accepted modern medical theories and procedures which are reasonably necessary and adequate, unaffected by budgetary considerations.” (Pisacano v. State of New York, 8 A D 2d 335, 339 [1959].) While it is true that there was a finding in the Pisacano case that cortisone was not available at Attica Prison on account of budgetary limitations, there was also in the record of the trial medical testimony as to the dangerous side effects possible as the result of cortisone therapy — ‘ ‘ renal shut-down, coronary occlusion, pulmonary hemorrhage,” — as well as testimony that cortisone had very limited and questionable use in the treatment of rheumatoid spondylitis and that APC and sodium salicylate were recognized forms of therapy. Surely, if the State Department of Correction is to be held to this degree of care in the administration of the institutions in its charge, then, the State Department of Health, which is manufacturing and distributing and making available State-wide to the medical profession for its use upon the populace agents of immunization against dread disease, must be required to keep up with modern medical theories and procedures in the field of its endeavors.
The defense that Dr. Kearney’s diagnosis was incorrect has, as its only foundation, the entry on the hospital record on September 13, 1954, that there were no current symptoms of tetanus. The Attorney-General also comments on the omission of Dr. Kearney, in his report to an insurance company, to mention the presence of trismus, or lockjaw. Neither this omission, nor Doctor Warfield Firor’s testimony that it was astounding to have a case of tetanus clear up in three days, convinces us that Frank Gielskie did not have tetanus on September 10, 1954.
Nor do we accept as a good defense here the reaction of the particular patient. It is true that the Attorney-General elicited from each of the two physicians called by the claimant who condemned intraspinous administration of tetanus antitoxin as well as from Dr. Firor, who still adheres to his opinion in support of that method, that he had never seen or treated a case of transverse myelitis which resulted from intraspinous injection. But this argument enters the field of speculation, as does the suggestion that Frank Gielskie’s difficulties began with his reaction to injections of penicillin given prior to September 10, 1954 and first used in the treatment of his injury. Laymen, as well as professional practitioners, are aware that not every human body can tolerate the drugs and serums used in modern *511 therapy. Risks must be taken by both doctor and patient. But it is not for us to theorize. Frank Gielskie received the tetanus antitoxin intraspinously. Frank Gielskie suffered the transverse myelitis. Frank Gielskie is a helpless invalid. Is his condition due to this defendant’s negligence?
The State of New York through its Division of Laboratories and Research in the Department of Health manufactured and distributed tetanus antitoxin. Thereupon it became the department’s duty to advise of the manner in which it could be safely used. (Marcus v. Specific Pharmaceuticals, 82 N. Y. S. 2d 194 [1948].) And, as Judge Hellee remarked (Gielskie v. State of New York; 3 Misc 2d 578, 583, supra), the fact that distribution was limited “ to members of the medical profession for use by them cannot serve to insulate the manufacturer and distributor from liability to the patient as a matter of law.” (Citing Wechsler v. Hoffman-La Roche, 198 Misc. 540‘[1950].) True, the two cases were, like that under consideration by my colleague, Special Term decisions on motions addressed to the pleadings. In the Wechsler case Judge Rabin (p. 542), addressing himself to the allegation of negligence in the pleading under consideration, recognized the right of the defendant to traverse the allegation of causation but, in doing so, said that a physician ‘ ‘ is entitled reasonably to rely upon the representations of reports and tests uttered by a large and reputable drug manufacturer. ’ ’
There is before us no issue in fact or in law of the possible liability of Dr. Kearney to respond in damages to this claimant. A finding here that the doctor had the right to rely upon the recommendations contained in Form LR 36-6 would not be an adjudication available to him as defense in another jurisdiction. The point is that the agents of this defendant should have expected, no doubt did expect, that any physician would rely upon the circularized recommendations. In fact, as the acting director of the Division of Laboratories testified, Form LR 36-6 “was intended to advise the physician using the same.” In addition, there was ample testimony upon the trial that the profession customarily relies upon instructions which accompany drugs and serums.
The State’s role in this instance is clearly distinguishable from its part in two fairly recent cases relied upon by the Attorney-General to defeat recovery herein. In Parker v. State of New York (280 App. Div. 157 [1952]) there was an emergency and transfusions of pooled blood plasma were administered with dire results. In affirming a dismissal of the suit after trial (201 Misc. 416), the Appellate Division, Third Department, *512 Mr. Justice BbrgaN (p. 160), held that the “ State was hound to know that the use of this type of plasma involved some risk, but with this knowledge it also knew that its use was justifiable when the risk involved ought, in good medical judgment, to be taken.” In Hidy v. State of New York (207 Misc. 207 [1955], affd. 2 A D 2d 644, affd. 3 N Y 2d 756) there was no emergency but the Fourth Department upheld a holding that there was no foreseeable risk. In both cases the State of New York was a mere distributor of the blood plasma, an occupation undertaken at the request of the American Red Cross. Here the State of New York was the manufacturer as well as the distributor. It was the instructor and adviser of therapeutic methods. Although it acknowledg’ed that: “ There is considerable difference of opinion as to which was the more effective route,” it had first said: “ The intraspinous and the intravenous methods are generally recognized as far superior to the intramuscular for the initial injections. ” And it added: ‘‘ On the basis of reports received on cases treated in the State, combined intravenous and intraspinous administration appears to possess an advantage.”
Dr. Kearney, who was admitted to practice in 1943 and had served in the U. S. Army in 1944-1946, testified that he had seen only one case of tetanus previous to 1954 and the patient had died; that in his seven years of private practice this (Frank Grielskie) was his first case of tetanus. Because of the development and use of tetanus antitoxin, the disease itself is of rare occurrence. But it was foreseeable that a young farmer, such as Frank Grielskie, would sustain an injury while working with horses, as he did, and would become a patient of a young practitioner who would rely upon the published recommendations distributed by the State’s agency with the serum which it manufactured and provided. The intervention of the physician with his hypodermic needle did not supersede the initial cause of this claimant’s present predicament. This was proximately caused by the State’s failure to keep up to date in its research; by its failure to revise its instructions in accordance with modern medical theories and procedures.
Claimant was 25 years old on September 10, 1954. He is an intelligent young man and was an informed, progressive and industrious farmer. He is permanently disabled with complete paralysis below the tenth dorsal vertebra., He has incurred expenses in medical care and treatment in excess of $6,717.35 and a loss of earnings of approximately $5,000 per annum. He will need continued medical and nursing care in the future. Including these elements of special damage and for pain and suffering we make an award in the amount of $175,000,
*513 We have marked requests to find submitted by claimant’s attorneys and by the Attorney-General and upon them together with this discussion of the facts and the law we direct entry of judgment in favor of the claimant and against the State of New York.