MARIE A. BALKOWITSCH AND ANOTHER v. MINNEAPOLIS WAR MEMORIAL BLOOD BANK, INC.

132 N. W. (2d) 805.

January 22, 1965—No. 39,240.

*Richard W. Johnson* and *Stewart R. Perry,* for appellants.
*Meagher, Geer, Markham & Anderson, O. C. Adamson II,* and *M. J. Coyne,* for respondent.

MURPHY, JUSTICE.

This is an appeal from a summary judgment for defendant in an action by which plaintiff Marie A. Balkowitsch sought to recover damages for personal injuries sustained when she contracted the disease of serum hepatitis from a transfusion of impure blood supplied by defendant, Minneapolis War Memorial Blood Bank, Inc. Plaintiff John Balkowitsch sought recovery based upon his derivative rights as the husband of Marie Balkowitsch. The claim is predicated upon a breach of implied warranty under a contractual sales-act theory as well as strict liability in tort.

The facts may be briefly stated. Between March 20 and March 29, 1958, quantities of whole blood were administered by transfusion to Mrs. Balkowitsch, hereinafter called plaintiff, while she was a patient at St. Mary's Hospital in Minneapolis. The blood she received was furnished by the defendant, the Minneapolis War Memorial Blood Bank, Inc. The transfusions were ordered by her physician. Prior to the receipt of the blood, ownership of it remained in the defendant. Payment was based upon the amount of blood received and was made directly by plaintiff to defendant. It does not seem to be disputed that the blood was contaminated and produced the disability from which plaintiff suffered. Neither is it claimed that defendant was negligent in the processing or distribution of the blood. Plaintiffs assert that defendant "sold" the blood to her, impliedly warranting its fitness and merchantable quality; that the blood was not as warranted in that it contained the virus; and as a consequence plaintiff sustained damages.

In considering the merits of plaintiffs' case, it is necessary to examine the function of defendant's activities and the nature of the service in which it is engaged. Defendant is a nonprofit public service

corporation engaged in the collection and storage of whole blood which is used for transfusion purposes. The process by which human blood is grouped and stored for use involves an advanced science which employs complex and elaborate facilities. The blood must be obtained, processed, stored, and transported so that it is immediately available in sufficient quantities, and carefully labeled as to group,[1] RH factor, and other pertinent data. Science has perfected storage techniques with the result that whole blood may be stored safely up to 21 days and blood derivatives, such as plasma, may be stored for longer periods of time. This program is carried on largely through the activities of the American Red Cross and 923 regional blood banks, of which defendant is one, and their branch banks. In addition to these, there are one national and five district "clearing house" offices which accomplish the interbank transfers of blood; five central and 18 regional reference laboratories; a central file of rare donors and a special bank of extremely rare blood.[2] The blood-bank arrangement provides an accessible place where sufficient quantities of all kinds of blood are readily available and from which people may obtain needed blood at actual cost.

In spite of the great advancements which have been made in the collection and storage of blood, there remain certain risks which medical science has been unable to eliminate. A few diseases may be communicated from person to person by blood transfusions. Some of these are susceptible to tests whereby their presence in the blood may be ascertained. But this is not so in respect to serum hepatitis, a virus disease which is also referred to in medical literature as homologous serum hepatitis or homologous serum jaundice or simply as SH virus.[3]

---

[1]The basic groups have now been divided into subgroups with the result that blood is often grouped as O, A, $A_2$, $A_3$, B, AB, $A_2B$, and $A_3B$. Am. Assn. of Blood Banks, *Technical Methods and Procedure* 11-13 (Rev. ed. 1962).

[2]U. S. Office of Emergency Planning, President's Health Resources Advisory Comm., Committee on Blood, Am. Assn. of Blood Bank's Report (1964).

[3]See Note, *Liability for Blood Transfusion Injuries,* 42 Minn. L. Rev. 640, 654, 655 (1958).

154

This situation is well summarized in the following passage quoted by defendant in its brief:

" 'Undoubtedly the most unsatisfactory situation in blood banking today is the inability to exercise any real control over the hazard of transmitting homologous serum jaundice by whole-blood transfusions. The risk is inherent in every bottle of blood issued. The problems of control are multiple: no donor's history is really reliable; any donor may be an innocent carrier; no laboratory test, or group of tests, is specific for the virus of hepatitis; there is no way of treating the blood to kill the virus without violating essential storage or safety requirements for whole blood; there is no susceptible laboratory test animal— man is the only known creature susceptible to the virus; and there are several ways, other than the transfusion of blood, by which the disease can be acquired. Finally, to complete the frustrating cycle, one can never prove or disprove that a given case of serum hepatitis was caused by a transfusion given within the incubation period of sixty to one hundred and eighty days. When a case is reported, one is invariably left with a presumptive diagnosis between incidental infectious hepatitis, transfusion-caused hepatitis or serum hepatitis due to the use of contaminated equipment in puncturing the skin. The thing that makes the sense of frustration really acute is that there now seem to be an increasing number of damage suits brought against blood banks because of injuries sustained by reason of alleged transfusion hepatitis.

" 'The obvious solution to the hepatitis problem, of course, is some test or tests that are specific within reasonable limits and are sufficiently simple and rapid to be employed either in the routine screening of donors or in the routine processing of a unit of blood. Considerable effort has been expended in this endeavor during the past five years or so to establish the validity of one or more of the standard tests of liver function in screening out donors who may be virus carriers. None of these tests, however, are specific for liver dysfunction, caused by the presence of the virus of hepatitis. * * *' Dr. John B. Alsever, *The Blood Bank and Homologous Serum Jaundice,* 261 New England Journal of Medicine 383 (1959)."

Relatively few serum hepatitis blood-transfusion cases have been re-

viewed by appellate courts. The earliest reported case, Parker v. State, 280 App. Div. 157, 112 N. Y. S. (2d) 695, involved a transfusion of pooled dried blood plasma which the Red Cross had acquired after the United States had declared it "war surplus." The action was brought against the state which had distributed the plasma on the theory of negligence. In holding against plaintiff, the court commented that the medical profession was well aware of the risk of serum hepatitis and that the state had a right to expect hospitals to rely on the judgment of the medical profession as to the circumstances requiring the use of the plasma. Negligence was also one of the grounds for an unsuccessful attempt to impose liability upon the State of New York as a distributor of Red Cross pooled plasma in Hidy v. State, 207 Misc. 207, 137 N. Y. S. (2d) 334, affirmed, 2 App. Div. (2d) 644, 151 N. Y. S. (2d) 621, affirmed, 3 N. Y. (2d) 756, 163 N. Y. S. (2d) 985, 143 N. E. (2d) 528; Fischer v. Wilmington General Hospital, 51 Del. 554, 149 A. (2d) 749. In discussing the asserted negligence involved in the latter case, the Delaware court said (51 Del. 561, 149 A. [2d] 753):

"Considering the frequency of the use of transfusions, the nature and extent of the risk involved in comparison with the alternative risk, the possible detrimental effect of advising patients of the risk and the general practice in the local medical profession not to so advise patients, the court feels impelled to conclude that this defendant [hospital] did not have a legal duty to plaintiff to advise her in advance that hepatitis might be communicated thereby. Consequently, defendant was not guilty of negligence."

In Merck & Co. v. Kidd (6 Cir.) 242 F. (2d) 592, a different approach was used. There, plaintiff claimed that his hepatitis resulted from plasma transfusions and thus the plasma was an adulterated drug within the meaning of the Tennessee Food, Drug and Cosmetic Act, which makes the sale of an adulterated drug negligence per se. In setting aside a judgment for plaintiff, the appellate court said (242 F. [2d] 594):

"* * * Despite every effort to screen the donors, it is recognized that the possibility that the hepatitis virus may be present in dried plasma

cannot be completely obviated. Moreover, if the virus is present, it cannot be discovered by microscopic examination or by any other test known to medical science. It cannot be removed nor destroyed by any known method which does not also destroy the utility of the plasma. As counsel for the appellee [plaintiff] concedes 'The only known way to determine whether the virus is present in any given lot of plasma is to give the plasma to a human volunteer and await developments.' "

These decisions illustrate the inability of medical science, despite all due care, to detect serum hepatitis in the blood. They recognize that since the medical profession is aware of the risk inherent in transfusions, due care does not impose on those who provide the blood a duty to warn the profession. It is a matter of medical judgment to determine whether in a particular case the benefits outweigh the risk.

In several other serum hepatitis blood-bank cases, plaintiffs adopted the theory employed here—that the transfusion constituted a sale. In Perlmutter v. Beth David Hospital, 308 N. Y. 100, 123 N. E. (2d) 792, the complaint alleged that while plaintiff was a paying patient in defendant hospital she purchased a blood transfusion for $60; that plaintiff relied upon the skill and judgment of the hospital and the implied warranty that the blood was "fit" for the intended purpose and was of "merchantable quality" and was not impure or contaminated. The sole question on defendant's motion for a dismissal was whether or not the transaction constituted a sale under the New York Sales Act—whether there was a vendor-vendee relationship between the hospital and the patient. In holding that the blood transfusion did not constitute a sale, and hence carried with it no warranties of fitness or merchantability, the court described the relationship between a hospital and its patients in these words (308 N. Y. 104, 123 N. E. [2d] 794):

"* * * The essence of the contractual relationship between hospital and patient is readily apparent; the patient bargains for, and the hospital agrees to make available, the human skill and physical materiel of medical science to the end that the patient's health be restored.

"Such a contract is clearly one for services, and, just as clearly, it is not divisible. Concepts of purchase and sale cannot separately be at-

tached to the healing materials—such as medicines, drugs or, indeed, blood—supplied by the hospital for a price as part of the medical services it offers. That the property or title to certain items of medical material may be transferred, so to speak, from the hospital to the patient during the course of medical treatment does not serve to make each such transaction a sale. ' "Sale" and "transfer" are not synonymous', and not every transfer of personal property constitutes a sale. (Halsted v. Globe Ind. Co., 258 N. Y. 176, 179 [179 N. E. 376, 377].) It has long been recognized that, when service predominates, and transfer of personal property is but an incidental feature of the transaction, the transaction is not deemed a sale within the Sales Act. ([Authorities cited]; see, also, 1 Williston on Sales [Rev. ed. 1948] §§ 54-55a, pp. 144-149; Benjamin on Sale [8th ed. 1950] p. 166; 77 C. J. S., Sales, § 2, p. 584; cf. Babcock v. Nudelman, 367 Ill. 626 [12 N. E. (2d) 635].) As Benjamin put it in his work on Sale (op. cit., p. 166), 'a contract of sale is not constituted merely by reason that the property in the materials is to be transferred * * *. If they are simply accessory to work and labour, the contract is for work, labour and materials. Such is the case of medicine supplied by a medical man to a patient, * * *'."

The same result was reached in Hidy v. State, *supra*; Koenig v. Milwaukee Blood Center, Inc. 23 Wis. (2d) 324, 127 N. W. (2d) 50; Dibblee v. Dr. W. H. Groves Latter-Day Saints Hospital, 12 Utah (2d) 241, 364 P. (2d) 1085; and Gile v. Kennewick Public Hospital Dist. 48 Wash. (2d) 774, 296 P. (2d) 662, 59 A. L. R. (2d) 761. In the latter case, the Washington court said (48 Wash. [2d] 782, 296 P. [2d] 667):

"We are satisfied that what the complaint in this allegation describes is not a purchase and sale of a given quantity of blood, but a furnishing of blood for what is referred to in the complaint as 'a routine transfusion * * * to promote the healing of the surgery' incidental to the contract of service between the hospital district and the patient."

From these authorities it is apparent that courts have rejected the sales analogy by which liability in blood-transfusion cases might be im-

posed on the theory of implied warranty. We agree with those courts which hold that the furnishing of blood is more in the nature of a service than in the sale of goods. It is our view that the law expressed in the Perlmutter case applies here.

Plaintiffs seek to distinguish the Perlmutter case on the basis that the defendant here is not a hospital as it was there. But we cannot concede that defendant, which is a nonprofit corporation, should be treated differently than a hospital or that it should be characterized as a commercial business which offers its products for sale in the market place in competition with others for the sole motive of making a profit. The acts performed by the hospital in the Perlmutter case are not so unrelated to those performed by the defendant in the case before us as to justify a different result.

In further support of their claim that the transaction is a sale within the meaning of Minn. St. 512.15, plaintiffs urge that the principle of law which should control here is stated in Beck v. Spindler, 256 Minn. 543, 99 N. W. (2d) 670, an express-warranty case relating to the purchase of a house trailer. In discussing whether plaintiff might also recover for breach of implied warranty of fitness against the manufacturer, we pointed out by way of dictum (256 Minn. 558, 99 N. W. [2d] 680):

"The doctrine of implied warranty is favored by this court, and such warranties should be given effect when it is possible to do so."

And also (256 Minn. 560, 99 N. W. [2d] 681):

"Historically, it probably was unfortunate that the implied obligation assumed by the seller or manufacturer was ever referred to as a warranty. It could as well have been referred to as an implied representation of fitness for the use for which it was made or sold, in which event the action could have continued as a tort action in the nature of one for deceit. It is difficult to justify a rule of law which permits recovery against the manufacturer on the theory of negligence and does not permit it on the theory that the manufacturer has represented that the product he puts out is fit for the use for which it is sold, no matter by what name that representation is denominated, where both

obligations arise, not from the agreement of the parties, but by an obligation imposed by law.".

The foregoing statement should be considered in the context of a discussion as to whether there may be liability to an ultimate consumer despite lack of privity between the parties. We pointed out in Bekkevold v. Potts, 173 Minn. 87, 89, 216 N. W. 790, 791, 59 A. L. R. 1164, 1166, that the origin and purpose of the implied warranty was "* * * to promote high standards in business and to discourage sharp dealings. It rests upon the principle that 'honesty is the best policy,' and it contemplates business transactions in which both parties may profit. * * * The doctrine of implied warranty should be extended rather than restricted." We do not lessen the force of the foregoing statement of law when we say that its application does not seem appropriate to the case before us. We find it difficult to give literal application of principles of law designed to impose strict accountability in commercial transactions to a voluntary and charitable activity which serves a humane and public health purpose. The activities involved in the transfusion of whole blood, a component of the living body, from one human being to another may be characterized as sui generis in that the sequence of events involve acts common to legal concepts of both a sale and a service. Moreover, it seems to us that under the facts in the case before us it would be unrealistic to hold that there is an implied warranty as to qualities of fitness of human blood on which no medical or scientific information can be acquired and in respect to which plaintiffs' physician has the same information, knowledge, and experience as the supplier.

Affirmed.