185 So.2d 749 (1966)
Mae O. RUSSELL, Appellant,
v.
COMMUNITY BLOOD BANK, INC., a Corporation, Appellee.
No. 5866.
District Court of Appeal of Florida. Second District.
April 22, 1966.
Rehearings Denied May 17, 1966.
Bryson & Patterson, St. Petersburg, for appellant.
John T. Allen, Jr., of Mann, Harrison, Mann & Rowe, St. Petersburg, for appellee.
SHANNON, Acting Chief Judge.
This is an appeal from an order granting the motion of the defendant, Community Blood Bank, Inc., to dismiss a complaint *750 filed by Mae O. Russell. The complaint alleged, in part:
"2. That on or about the 22nd day of June, 1963, the Plaintiff was a patient at Mound Park Hospital in St. Petersburg, Florida, and as a result of her illness was in need of a blood transfusion. That the Defendant sold certain blood to the Plaintiff for this purpose. Said blood was administered to the Plaintiff by persons other than the agents, servants or employees of the Defendant.
"3. That the Defendant knew or should have known that the blood sold by it to the Plaintiff was intended to be administered to the Plaintiff in the form of a blood transfusion. That the said blood was in fact so administered.
"4. That the said blood sold to the Plaintiff and administered to her in the form of said transfusion was impure and unfit for the use intended, as it contained a certain virus commonly known as serum hepatitis. That as a direct result of the use and administration of said impure and unfit blood, the Plaintiff contracted the disease commonly known as serum hepatitis.
"5. That the sale and condition of said blood was a breach of the implied warranties of merchantability and fitness for the use intended, to-wit, to be administered to the Plaintiff in the form of a blood transfusion. That said implied warranties arose between the Defendant as seller and the Plaintiff as buyer of said blood. That the sale of said blood was a transaction between the Plaintiff and Defendant complete in itself and entirely apart from any services rendered to the Plaintiff by Mound Park Hospital, its agent, servants or employees, or any other person."
The defendant moved to dismiss, alleging, inter alia, that plaintiff's complaint failed to state a cause of action in that: 1) the complaint failed to allege facts sufficient to state a claim upon which any relief could be granted; 2) the complaint failed to allege facts which would constitute a sale or contract between plaintiff and the defendant; and 3) the complaint showed that the transaction constituted a service and not a sale.
The trial judge dismissed the complaint in an order in which he noted that there were no Florida cases in point, but that under the law of other jurisdictions the transfer of blood by a hospital or a blood bank is a service, not a sale, and that an implied warranty is not applicable to the "sale" of blood. The pleadings and this order comprise the total record on appeal.
The issue before this court is whether the complaint states a cause of action. In answering this question we must remember that a defendant moving to dismiss a complaint is deemed, for the purpose of ruling on the motion, to have admitted all facts well pleaded in the complaint, as well as all reasonable inferences arising from those facts. E.g., Jackson Tom, Inc. v. Carlton, Fla.App. 1961, 133 So.2d 752.
Perlmutter v. Beth David Hospital, 308 N.Y. 100, 123 N.E.2d 792 (1954), is the leading case on the subject of implied warranty in the sale of blood. The plaintiff in Perlmutter sued the hospital for injuries resulting from the transfusing of "bad" blood, supplied by the hospital for a price as part of the services rendered by the hospital. Recovery was not sought on grounds of negligence, but upon the theory that the supplying of blood constituted a sale within the Sales Act and that, as a consequence, there attached implied warranties that the blood was reasonably fit for its intended purpose and of merchantable quality. The defendant's motion to dismiss had been denied by the trial court, and the decision was affirmed by the appellate division. The question was then certified to the Court of Appeals, which reversed, in a four-three decision, holding that the transaction was not a sale because a hospital contracts with *751 a patient to provide services. The Court said:
"Such a contract is clearly one for services, and, just as clearly, it is not divisible. Concepts of purchase and sale cannot separately be attached to the healing materials  such as medicines, drugs or, indeed, blood  supplied by the hospital for a price as part of the medical services it offers. That the property or title to certain items of medical material may be transferred, so to speak, from the hospital to the patient during the course of medical treatment does not serve to make each such transaction a sale. `"Sale" and "transfer" are not synonymous', and not every transfer of personal property constitutes a sale. Halsted v. Globe Indemnity Co., 258 N.Y. 176, 179, 179 N.E. 376, 377. It has long been recognized that, when service predominates, and transfer of personal property is but an incidental feature of the transaction, the transaction is not deemed a sale within the Sales Act. * * *
* * * * * *
"While determination, as to whether the essence of a particular contract is for the rendition of services or for the sale of property, may at times be troublesome and vexatious, there is no doubt that the main object sought to be accomplished in this case was the care and treatment of the patient. The supplying of blood by the hospital was entirely subordinate to its paramount function of furnishing trained personnel and specialized facilities in an endeavor to restore plaintiff's health. It was not for blood  or iodine or bandages  for which plaintiff bargained, but the wherewithal of the hospital staff and the availability of hospital facilities to provide whatever medical treatment was considered advisable. The conclusion is evident that the furnishing of blood was only an incidental and very secondary adjunct to the services performed by the hospital and, therefore, was not within the provisions of the Sales Act. * * *" 123 N.E.2d at 794, 795.
The court distinguished the situation in which a person buys food, rather than service, in a restaurant, by stating that a customer enters a restaurant with the idea of buying food, but that a patient goes to a hospital for medical treatment, and not to buy medical supplies.
The opinion of the majority also stated that:
"* * * Informed opinion is at hand that there is today neither a means of detecting the presence of the jaundice-producing agent in the donor's blood nor a practical method of treating the blood to be used for transfusion so that the danger may be eliminated * * *." 123 N.E.2d at 795.
This case has been expressly followed in other jurisdictions in which suit for breach of implied warranty in the sale of blood was brought against a hospital, Sloneker v. St. Joseph's Hospital, 233 F. Supp. 105 (D. Colo. 1964); Gile v. Kennewick Public Hospital Dist., 48 Wash.2d 774, 296 P.2d 662, 59 A.L.R.2d 761 (1956); Koenig v. Milwaukee Blood Center, Inc., 23 Wis.2d 324, 127 N.W.2d 50 (1964); Dibblee v. Dr. W.H. Groves Latter-Day Saints Hospital, 12 Utah 2d 241, 364 P.2d 1085 (1961). These courts are unanimous in holding that a transfer of blood by a hospital to a patient is not a sale but a service. The rule has been extended to the situation in which the plaintiff sues the blood bank furnishing the blood to the hospital, for which there is a separate charge, the courts holding that the service aspect of the transaction predominates, Whitehurst v. American National Red Cross, 1 Ariz. App. 326, 402 P.2d 584; Balkowitsch v. Minneapolis War Memorial Blood Bank, Inc., 1965, 270 Minn. 151, 132 N.W.2d 805. The alleged defect in these latter cases was the serum hepatitis virus, and the courts were impressed with the admitted or demonstrated inability to detect or remove the defect. In analogous *752 situations courts have immunized hospitals from liability for mismatched blood on the theory that mismatching is negligence, a tort, for which liability charitable institutions in their jurisdictions were immune, Goelz v. J.K. & Susie L. Wadley Research Institute & Blood Bank, Tex. Civ.App. 1961, 350 S.W.2d 573; Gile v. Kennewick Public Hospital Dist., supra, and that an action in implied warranty, ex contractu, could not lie because furnishing of blood was not a sale. Ibid. One court recognized that a distinction might possibly be drawn between a hospital which furnished medical services, and a blood bank which collected the blood and supplied it to the hospital, but declined to decide the question since it was not then in issue. Koenig v. Milwaukee Blood Center, Inc., supra, 127 N.W.2d at 52.
We believe there is a distinction between a suit against a blood bank as opposed to a hospital, despite authority to the contrary. The original "service rather than sale" rationale, even as applied to hospitals, has been criticized, e.g., Perlmutter v. Beth David Hospital, supra, 123 N.E.2d 792, 796 (dissenting opinion); 103 U.Pa.L.Rev. 833 (1954-55), and questioned, Gottsdanker v. Cutter Laboratories, 1960, 182 Cal. App.2d 602, 6 Cal. Rptr. 320, 324, 79 A.L.R.2d 290. It is evident from our research that although many of the decisions denying recovery for breach of implied warranty are based on the technical distinction between a service and a sale, the factor underlying the decisions is the inability, in the present state of medical knowledge, to detect or remove the virus which causes serum hepatitis. It is often stated that it would be against public policy to impose strict warranty liability, for an undetectable, unremovable defect, against a non-commercial organization which was supplying a commodity essential for medical treatment. See Balkowitsch v. Minneapolis War Memorial Blood Bank, supra; Dibblee v. Dr. W.H. Groves, supra; cf. Merck & Co., Inc. v. Kidd, 242 F.2d 592 (6th Cir.1957). The Perlmutter court was concerned with the supplier becoming, in effect, an insurer of a patient should anything happen as a result of "bad" blood.
In light of this patent concern for the public policy involved in the question, we feel compelled to depart from the "sale versus service" category and to examine the issue here as one primarily involving the question of implied warranty. On this level, expressions of sound policy preferences are more in harmony with the doctrine with which we will be dealing. Compare Prosser, Strict Liability to the Consumer, 69 Yale L.J. 1099, 1114-1124 (1960). Regardless of the fact that a hospital supplying whole blood to a patient may be merely performing a service incident to the over-all medical attention being furnished, we are not willing to extend this "service" characterization to the blood bank which originally collects and distributes the commodity. It seems to us a distortion to take what is, at least arguably, a sale, twist it into the shape of a service, and then employ this transformed material in erecting the framework of a major policy decision. Florida has rejected the "service" rule in the sale of food by a restaurant, Cliett v. Lauderdale Biltmore Corp., Fla. 1949, 39 So.2d 476, and we apply the rationale of that case to reject the "service" rule here, in a suit against the blood bank.
Before proceeding further, it may be well for us to sharpen the focus on the issue that is emerging. First, it is important to note that there is no attempt by the blood bank to assert that it would be immune from a tort action. The relevancy of this point is that we are not deciding whether a blood bank can be sued, because unquestionably it can, even if it is a corporation not for profit. Fla. Stat., Sec. 617.021(1) (b), F.S.A. Second, we must emphasize the posture of the case as the record stands before us, which is the dismissal of a complaint on motion to dismiss, with no factual evidence having been submitted.
We will now proceed to the real questions involved in this appeal, which are *753 whether there are any implied warranties attached to the sale of blood by a blood bank, what these warranties might be, and whether these warranties run to the ultimate consumer. We have found no case in which such a warranty has been implied. See, generally, Annot. 59 A.L.R.2d 770. The rationale of the cases denying liability seems to be, as we have previously discussed, that the defect which causes the harmful virus in the blood cannot be detected and therefore it is against public policy to hold hospitals and blood banks strictly liable when they are supplying a commodity essential to health. Other factors which have also been used to buttress the decisions are that blood suppliers are not profit-making commercial enterprises advertising their wares to the general public or proclaiming the superiority of their product over that of another brand. Balkowitsch v. Minneapolis War Memorial Blood Bank, Inc., supra, 132 N.W.2d at 810; Dibblee v. Dr. W.H. Groves, supra, 364 P.2d at 1087. In addition, the patient's reliance on the attending physician's skill and judgment, rather than upon that of the blood supplier, has been urged as a factor tending to obviate the applicability of implied warranty. See Balkowitsch, supra; cf. Fischer v. Wilmington General Hosp., 1 Storey 554, 51 Del. 554, 149 A.2d 749 (1959).
Notwithstanding the above reasons, and in light of our decision to term the supplying of blood by a blood bank to a patient for a consideration as a sale, we are drawn to the conclusion that the law of implied warranties applies to the transaction before us. Accord, Frumer and Friedman, Products Liability, Sec. 16.03 [4], p. 383 (1965).
In Gottsdanker v. Cutter Laboratories, 1960, 182 Cal. App.2d 602, 6 Cal. Rptr. 320, a drug manufacturer was sued for breach of implied warranty arising from the sale of Salk polio vaccine. The vaccine administered to plaintiffs had been purchased by a doctor from a pharmacy in a sealed container. The injections were given under a doctor's direction. The court affirmed judgments against the manufacturer on the theory of implied warranty, stating:
"* * * The vaccine is intended for human consumption quite as much as is food. We see no reason to differentiate the policy considerations requiring pure and wholesome food from those requiring pure and wholesome vaccine. * * *" 6 Cal. Rptr. at 323.
We believe the same rationale is applicable to the sale of blood, even though there are obvious distinctions which may be drawn between the manufacturers of a vaccine and the collector and distributor of blood. We are also aware of the different context in which the quoted statement was made, yet we are convinced of the soundness of this position. See Blanton v. Cudahy Packing Co., 1944, 154 Fla. 872, 19 So.2d 313; Spencer v. Carl's Markets, Inc., Fla. 1950, 45 So.2d 671. Cf. Frumer and Friedman, Products Liability, Sec. 16.04 [3] [b] (1965).
The real danger of applying implied warranty to blood is that, according to the opinions we have read, the defect of serum hepatitis virus cannot be eliminated, regardless of the amount of inspection or care. In light of this fact, the case of Green v. American Tobacco Co., Fla. 1963, 154 So.2d 169, is especially ominous. In Green the Florida Supreme Court held that:
"* * * [O]ur decisions conclusively establish the principle that a manufacturer's or seller's actual knowledge or opportunity for knowledge of a defective or unwholesome condition is wholly irrelevant to his liability on the theory of implied warranty * * *.
* * * * * *
"No reasonable distinction can, in our opinion, be made between the physical or practical impossibility of obtaining knowledge of a dangerous condition, and scientific inability resulting from a current lack of human knowledge and skill. * * *" 154 So.2d at 170, 171.
*754 Immediately following this last quoted passage the court cited Spencer v. Carl's Markets, Inc., Fla. 1950, 45 So.2d 671, which imposed liability on a retailer for sale of a can of sardines which he could not have known was dangerous without destroying the product's saleability. However, in the subsequent case of McLeod v. W.S. Merrell Co., Fla. 1965, 174 So.2d 736, the court held that a retail druggist filling a prescription from a medical doctor with an unadulterated prepackaged drug was not liable to the patient-purchaser for breach of implied warranty when the drug produced harmful effects on the purchaser. The court distinguished the Green case on two grounds. First, that Green was a suit against a manufacturer, while McLeod was against a retailer; and second, that Green involved cigarettes, a commodity available to the public generally, while McLeod involved a drug only available by prescription. The court in McLeod noted that the patient-purchaser of the drug did not rely on the judgment of the retail druggist in assuming that the drug would be fit for its intended purpose, but that this confidence was placed in the prescribing physician. As for the warranty of merchantability, or wholesomeness, by which goods must be fit for ordinary uses, the court noted that the plaintiff was seeking to hold the retail druggists absolutely and strictly liable without fault. The court refused to apply this liability against the druggists and cited Sec. 402A of the Restatement of Torts, Comment (k). The cited comment, entitled "Unavoidably Unsafe Products," excepts from strict liability manufacturers and sellers of therapeutic products, which, in the present state of human knowledge, are incapable of being made absolutely safe for their intended and ordinary uses.
By its citation of the Restatement, we are of the opinion that the Supreme Court was indicating its approval of the category noted there. Accordingly, we feel justified in examining the cited section to see if it has relevance to the situation before us. Comment (k) states, in part:
"There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. * * * Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it unreasonably dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk."
It appears to us that this position is entirely reasonable, as well as being good public policy. We further believe that it accords with the law of this State. In McLeod, supra, the Supreme Court spelled out a limited set of warranties applicable to a retail druggist filling prescriptions, saying:
"* * * [T]he rights of the consumer can be preserved, and the responsibilities of the retail prescription druggist can be imposed under the concept that a druggist who sells a prescription warrants that (1) he will compound the drug *755 prescribed; (2) he has used due and proper care in filling the prescription (failure of which might also give rise to an action in negligence); (3) the proper methods were used in the compounding process; (4) the drug has not been infected with some adulterating foreign substance. * * *" 174 So.2d at 739.
Similar warranties might be said to run from a blood bank to the ultimate consumer. See Lily-Tulip Cup Corp. v. Bernstein, Fla. 1966, 181 So.2d 641; Spencer v. Carl's Markets, Inc., supra; and Blanton v. Cudahy Packing Co., supra.
We have discussed the implied warranties which may be applicable to the sale of blood while assuming that its properties are such that it falls into the category of "unavoidably unsafe." This assumption is unfounded, because there is no medical evidence in this record, and we are unable to judicially notice the medical testimony offered as evidence in some other lawsuit. Therefore, before the product can be termed "unavoidably unsafe," there will have to be some factual showing that it cannot be made safe. In the posture of this case now, the complaint states a cause of action.
Having thus wound our way through the maze of legal theories surrounding implied warranty liability, we have reached a point in which we are stating that a plaintiff can state a cause of action against a blood bank for breach of implied warranty, but can only recover for injuries if they were caused by the failure to detect or remove a deleterious substance capable of detection or removal. Admittedly, this language goes right to the threshold of a suit for negligence, and this apparent anomaly in legal theory has been recognized before. Lartigue v. R.J. Reynolds Tobacco Co., 317 F.2d 19 (5th Cir.1963); Frumer and Friedman, supra, Sec. 16.03 [4], p. 386.3; but see Green v. American Tobacco Co., Fla. 1963, 154 So.2d 169. However, the practical effect of the difference between an action in negligence and one in implied warranty when dealing with a product "unavoidably unsafe" is to shift the burden of proof. Compare, Prosser, Strict Liability to the Consumer, supra, 69 Yale L.J. 1114-1117. A complaint for negligent failure to inspect places the onus upon plaintiff to prove the manufacturer negligent, even though he may be aided by the presumption of res ipsa loquitur. Ibid. For breach of implied warranty, however, plaintiff must only show that the product was transferred from the manufacturer's possession while in a defective state, and as a result of the defect, the plaintiff was injured. A showing of due care on the manufacturer's part is not a defense to breach of implied warranty. However, should the product be one which cannot be made absolutely safe, but is nevertheless essential to human health, and where its use is prescribed by a physician who is made fully aware of the risk of harm, but who, in his sound medical judgment, believes that taking the risk is justified, then the fact that there is an unavoidable defect in a certain percentage of the product will not result in a breach of warranty. See Restatement (Second), Torts, Sec. 402A, Comment (k). This could be the case with blood supplied by a blood bank, and, if so, then proof that the defect in blood is undetectable and unremovable would be a defense to breach of implied warranty. However, the burden of this proof would be on the blood bank. Compare, Frumer and Friedman, supra, Sec. 16.03 [4].
From what we have here before us we cannot say as a matter of law that there is no implied warranty in the sale of blood by the defendant blood bank. Accordingly, the complaint states a cause of action and the trial judge erred in dismissing it, even though we recognize that the authority from other jurisdictions supports the trial judge's ruling. From our research we have found that in the New York decision of Perlmutter, decided in 1954, the court alluded to medical evidence *756 which had not been included in the record. Perlmutter, however, stands primarily for the proposition that the transfer of blood by a hospital is not a sale, and since we have rejected this characterization when applied against the blood bank, we are unable to agree with the position that blood carries no implied warranty, without there first being a showing in the record that the particular defect was undetectable. Therefore, because there is no proof here that the defect could not have been found or prevented, we reverse the order appealed and remand the cause for further proceedings consistent with this opinion.
Reversed and remanded.
LILES, J., and PATTON, ROBERT W., Associate Judge, concur.