196 So.2d 115 (1967)
COMMUNITY BLOOD BANK, INC., a Corporation, Petitioner,
v.
Mae O. RUSSELL, Respondent.
No. 35417.
Supreme Court of Florida.
March 1, 1967.
*116 Mann, Harrison, Mann & Rowe, and John T. Allen, Jr., St. Petersburg, for petitioner.
Bryson & Patterson, St. Petersburg, for respondent.
D. Fred McMullen, and Ausley, Ausley, McMullen, O'Bryan, Michaels & McGehee, Tallahassee, for Florida Association of Blood Banks, Lewis, Roca, Scoville, Beauchamp & Linton, Paul M. Roca, James Moeller, Paul G. Ulrich, Phoenix, Ariz., Keen, O'Kelley & Spitz, A. Frank O'Kelley and Victor Cawthon, Tallahassee, for Blood Services, as amici curiae.
PER CURIAM.
This cause is before this court on petition for certiorari to review, on direct conflict grounds, the decision of the District Court of Appeal, Second District, in Russell v. Community Blood Bank, Inc., Fla.App. 1966, 185 So.2d 749.
The decision brought here for review actually decided two separate points of law, one of which (as to whether the transaction sub judice constituted a sale rather than a service) was decided in accordance with the previous decisions of this court; however, the court's ruling on the other point of law (referred to more particularly hereafter) is in direct conflict with the decision of this court in Green v. American Tobacco Company, Fla. 1963, 154 So.2d 169, and cases therein cited. Accordingly, jurisdiction attaches under the "direct conflict" provision of Section 4, Article V, Fla. Const., F S.A.
*117 The respondent, plaintiff below, sued the petitioner-defendant to recover damages sustained when she contracted the disease "serum hepatitis" from a blood transfusion administered to her while a patient in a hospital (not made a party to this suit). As the basis for her complaint against petitioner-defendant (hereafter referred to as "the Blood Bank"), the plaintiff alleged that the blood was sold to her by the Blood Bank as a separate transaction "complete in itself and entirely apart from any services rendered" to her by the hospital; that the blood as impure in that it contained the virus known as serum hepatitis; and that "the sale and condition of said blood was a breach of the implied warranties of merchantability and fitness for the use intended, to-wit, to be administered to the Plaintiff in the form of a blood transfusion."
The Blood Bank filed a motion to dismiss the complaint upon the ground, among others, that the complaint showed on its face that the transaction between the parties constituted a service rather than a sale to which an implied warranty of merchantability and fitness could attach; hence, that no cause of action for breach of implied warranty was stated. In support of this defense the Blood Bank relied on decisions of courts of other jurisdictions in which the supplying of blood by a hospital or blood bank was held to be a service rather than a sale. See Perlmutter v. Beth David Hospital. (1954), 308 N.Y. 100, 123 N.E.2d 792 (said to be the leading case on the subject); Goelz v. J.K. & Susie L. Wadley Research Institute and Blood Bank (Tex.Civ.App. 1961), 350 S.W.2d 573; Balkowitsch v. Minneapolis War Memorial Blood Bank (1965), 270 Minn. 151, 132 N.W.2d 805; and Whitehurst v. American National Red Cross (1965), 1 Ariz. App. 326, 402 P.2d 584. Finding these decisions "persuasive", the trial court granted the motion to dismiss. The appeal by plaintiff followed, culminating in the decision here reviewed.
The controlling question in the trial court on the motion to dismiss was whether or not the complaint stated a cause of action. The complaint alleged, among other things, "that the Defendant sold certain blood to the Plaintiff for this purpose" (emphasis supplied.) and then alleges that "the blood sold to the Plaintiff and administered to her in the form of said transfusion was impure and unfit for the use intended as it contained a certain virus commonly known as serum hepatitis"; that an implied warranty arose between the defendant, as seller, and plaintiff, as buyer, of the blood. Damages were claimed on the alleged breach of warranty.
A motion to dismiss by the defendant was granted with prejudice by the trial court, holding that the transaction was a service rather than a sale, and further reciting `that there is not a known way to determine whether blood given in a transfusion would actually have serum hepatitis in it * * *". On review the District Court of Appeal, Second District, reversed the decision of the trial court and remanded for further proceedings, thus holding that the complaint on its face stated a cause of action. The issues of fact would then be settled by trial.
Up to this point the District Court was eminently correct in reversing the trial court and remanding the cause for trial on issues of fact. See Green v. American Tobacco Company, supra. However, because the trial court had unnecessarily gone further than the controlling question and had given consideration to the question of whether or not there is a known way to determine whether blood given in a transfusion would actually have serum hepatitis in it, the District Court felt impelled to also delve into that subject. The question of whether there is a recognized method of detection was premature since that question is one of fact, and it was error for the trial court to settle it with a pronouncement of law. For the same reason it was premature and error for the District Court to undertake to settle as a question of law that, which under the pleadings, would be *118 a question of fact. We do not here review, consider or decide as a question of law whether or not there is a recognized method of detection, for frankly we do not know and do not have any record of testimony before us from which to consider it, nor have we considered whether, if established by the fact, such would constitute a legal defense as that question is premature for the same reason. It is therefore our view, and we hold, that the trial court should have denied the motion to dismiss for the reason that the complaint stated a cause of action.
For the reasons stated that portion of the judgment of the District Court of Appeal which reverses the trial court and remands the cause for further proceedings (trial) was correct, but that part of the opinion which discusses other and premature questions and announcing prematurely what would constitute a defense is surplusage and is hereby expunged. The opinion of the District Court having been thus revised, the writ of certiorari is discharged.
It is so ordered.
THOMAS, ROBERTS, DREW and ERVIN, JJ., concur.
ROBERTS, J., concurs specially with Opinion.
O'CONNELL, J., concurs in part and dissents in part with Opinion.
THORNAL, C.J., and CALDWELL, J., dissent.
ROBERTS, Justice (concurring specially).
I have agreed with the majority opinion remanding the case for trial on the facts. However, both the trial court and the District Court of Appeal have involved and decided other vital questions of law, and the opinion of the District Court has been published. See 185 So.2d 749. In the interest of uniformity of decision, I therefore deem it necessary to comment on the pronouncements of law made by the District Court.
As to the first point of law mentioned above, the appellate court reviewed the cases from other jurisdictions relied upon by the Blood Bank and rejected the "service rather than sale" rule as applied to a blood bank which originally collects the commodity and supplies it to a patient for a consideration. Noting that the underlying factor in most, if not all, of such decisions was that "it would be against public policy to impose strict warranty liability, for an undetectable, unremovable defect, against a non-commercial organization which was supplying a commodity essential for medical treatment," the appellate court said:
"It seems to us a distortion to take what is, at least arguably, a sale, twist it into the shape of a service, and then employ this transformed material in erecting the framework of a major policy decision. Florida has rejected the `service' rule in the sale of food by a restaurant, Cliett v. Lauderdale Biltmore Corp., Fla. 1949, 39 So.2d 476, and we apply the rationale of that case to reject the `service' rule here, in a suit against the blood bank." 185 So.2d at page 752.
I agree. A transaction whereby a blood bank, which is engaged in the business of collecting and distributing blood, transfers the title to the commodity to a patient for a consideration, is unquestionably a "sale", whether tested by the law in effect at the time of the transaction sub judice, see Edwards v. Baldwin Piano Co., 1920, 79 Fla. 143, 83 So. 915; Cliett v. Lauderdale Biltmore Corp., Inc., Fla. 1949, 39 So.2d 476; or by the new Uniform Commercial Code, Ch. 671 and 672, Fla. Stat. 1965, F.S.A., effective January 1, 1967.
Nor can it be questioned that the commodity in question  blood supplied for the purpose of a blood transfusion  is a product *119 "intended for human consumption" quite as much as is a vaccine, cf. Gottsdanker v. Cutter Laboratories, 1960, 182 Cal. App.2d 602, 6 Cal. Rptr. 320, 69 A.L.R.2d 290, or a food product; and it is well settled in this jurisdiction that the manufacturer or producer of a product intended for human consumption or intimate body use is held strictly liable, without fault, for consequential injuries to a consumer or user resulting from a defect in such product. See Blanton v. Cudahy Packing Company, 1944, 154 Fla. 872, 19 So.2d 313; Carter v. Hector Supply Co., Fla. 1961, 128 So.2d 390; Green v. American Tobacco Co., supra, 154 So.2d 169; Wagner v. Mars, Inc., Fla.App. 1964, 166 So.2d 673; Bernstein v. Lily-Tulip Cup Corp., Fla.App. 1965, 177 So.2d 362.
It was at this point, however, that the appellate court took an entirely new approach to the strict or implied warranty theory of liability, as established by this court. It ruled, as to products which it termed "unavoidably unsafe", that
"* * * a plaintiff can state a cause of action against a blood bank for breach of implied warranty, but can only recover for injuries if they were caused by the failure to detect or remove a deleterious substance capable of detection or removal." 185 So.2d at page 755. (Emphasis supplied.)
This holding runs counter to the very basis of the strict or implied warranty theory of liability  that is, liability without fault  and is in direct conflict with the decision of this court in Green v. American Tobacco Co., supra, 154 So.2d 169.
In the Green case, a cigarette manufacturer was held liable for the injurious consequences resulting from the use of its product even though, at the time of the sale and consumption thereof by the plaintiff's decedent, the harmful effects of the product were not and could not, by the reasonable application of human skill and foresight, have been known by the manufacturer-defendant. In holding that the trial court erred in instructing the jury that "implied warranty does not cover substances in the manufactured product the harmful effects of which no developed human skill or foresight can afford knowledge", this court said:
"Upon the critical point, our decisions conclusively establish the principle that a manufacturer's or seller's actual knowledge or opportunity for knowledge of a defective or unwholesome condition is wholly irrelevant to his liability on the theory of implied warranty * * *".
We also said that
"No reasonable distinction can, in our opinion, be made between the physical or practical impossibility of obtaining knowledge of a dangerous condition, and scientific inability resulting from a current lack of human knowledge and skill."
It may be conceded that, in the present state of our scientific knowledge, the virus of serum hepatitis cannot be detected in the donor or in the whole blood after it is taken; but neither is there any practical way of discovering a defect in a tin of canned meat (Blanton v. Cudahy Packing Company, supra, 19 So.2d 313), or in a candy bar sealed in a paper wrapper (Wagner v. Mars, Inc., supra, 166 So.2d 673), or in a bottled drink (Florida Coca-Cola Bottling Co. v. Jordan, Fla. 1953, 62 So.2d 910) or typhoid bacilli in clams (Kenower v. Hotels Statler Co., C.A.6th 1942, 124 F.2d 658). In each of these cases the presence of the adulterating substance could not have been discovered without destroying the salability of the product; and in the Green case, supra, 154 So.2d 169, the deleterious effect of the adulterating substance was not known at the time of its consumption. These decisions stand for the proposition that the seller of a product intended for human consumption is liable for injurious consequences resulting from the consumption of a defective or adulterated product, even though it was at the time of the sale and consumption of *120 such product practically or scientifically impossible to discover the defect in or adulteration of such product.
The decision of this court relied upon by the appellate court in support of its ruling, McLeod v. W.S. Merrell Co., Fla. 1965, 174 So.2d 736, and the Restatement of Torts citation (Sec. 402A, comment (k)), are not in conflict with the Green case and other decisions cited above. In the McLeod case, a retail druggist filling a prescription from a medical doctor with an unadulterated prepackaged drug was sued by the patient-purchaser for breach of implied warranty when the drug produced harmful effects on the purchaser. Noting that the purchaser relied upon the prescribing physician as to the warranty of fitness, we held that the retail druggist could not be held liable on the theory of breach if implied warranty of merchantability where the drug supplied to the plaintiff was, in fact unadulterated. The comment made in the Restatement, supra, as to products termed "unavoidably unsafe", is that
"* * * The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk." (Emphasis added.)
There is nothing in this statement, nor in the McLeod case, supra, inconsistent with our decisions in the Green and other cases, cited above. The key word  the distinguishing feature of the two lines of cases  is the word "unadulterated". There is a clear distinction between a product which is not adulterated  one which meets all the standards established for a particular product but which is attended with a known risk to the consumer  and a product which is, in fact, adulterated and defective  that is, which does not meet the standards established for this particular product  and which would, because of such unknown and undetectable defect, produce a harmful effect upon any consumer thereof. The product in the McLeod case was in the former category; the product with which we are here concerned is in the latter category, along with canned meat, bottled drinks, candy sealed in a wrapper, and other similar products intended for human consumption.
It should be held, therefore, that the decision of the appellate court to the effect that a manufacturer or producer of a product for human consumption is liable for breach of warranty only if the deleterious substance is capable of detection or removal, is in direct conflict with our decisions in the Green case, supra, 154 So.2d 169, and similar cases, and cannot stand.
I have considered whether an exception should be made in the case of a non-profit organization, such as the defendant Blood Bank, to the rule of strict liability in this situation on "public policy" grounds. And I agree with the statement of the Minnesota court in Balkowitsch v. Minneapolis War Memorial Blood Bank, Inc., supra, 132 N.W.2d 805, that it is
"* * * difficult to give literal application of principles of law designed to impose strict accountability in commercial transactions to a voluntary and charitable activity which serves a humane and public health purpose."
I feel, however, that we have no alternative but to hold the defendant Blood Bank to the same liability as other manufacturers or producers of products intended for human consumption. This court early took the lead (at a time when the great weight of authority was to the contrary) in holding that hospitals, even though non-profit charitable institutions, are liable for the torts of their servants in injuring patients, as against the contention that charitable institutions should be held immune from the torts of their servants as a matter of public *121 policy. See Nicholson v. Good Samaritan Hospital, 1940, 145 Fla. 360, 199 So. 344, 133 A.L.R. 809. Noting that the public policy of this state, as declared by Section 4 of the Declaration of Rights of our Florida Constitution, "is to put justice `by due course of law' above or before charity", this court said:
"There is no legal principle which would justify this Court in making such an exception, in view of the above quoted constitutional provision. The creation of such exemptions is a legislative prerogative." 199 So. at page 348.
By the same token, the creation of an exemption to the "strict liability" rule should be undertaken by the Legislature rather than the courts.
The rule adopted by this court in the Nicholson case appears to have gained favor in other jurisdictions. See the annotation in 25 A.L.R.2d p. 29 et seq. on the subject "Immunity of non-governmental charity from liability for damages in tort." As stated by the commentator (25 A.L.R.2d at page 58):
"The modern tendency of the law is to shift the burden from the innocent victim to the community at large, and to distribute losses incurred by individuals through the operation of an enterprise among all who benefit by it rather than to leave them wholly to be borne by those who sustained them; * * * ".
This statement is just as applicable to the strict or implied warranty theory of liability as to the tort liability with which we were concerned in the Nicholson case. The rationale of the rule of strict liability has been said to be the "right, justice and welfare of the general purchasing and consuming public." Blanton v. Cudahy Packing Co., supra, 19 So.2d 313. And, in my opinion, it is more consonant with right and justice to require the Blood Bank to be held absolutely and strictly answerable to the consumers of its product for defects therein, so that the burden of the losses resulting therefrom may be spread among all who benefit from the operation of the blood bank, rather than to require such losses to be borne by the innocent victims alone.
In short, here, as in the Nicholson case, supra, 199 So. at page 350,
"We find no sound and satisfying legal principle which, as we view it, forms a just basis for the exemption from liability claimed by the defendant below in the case at bar. We say this with all due respect for the many able courts who have taken a contrary view on the questions involved."
Accordingly, for the reasons stated I would quash the decision of the appellate court on the second point of law referred to above.
DREW and ERVIN, JJ., concur.
O'CONNELL, Justice (concurring in part and dissenting in part).
I agree that the complaint stated a cause of action and that the issue of detectability of serum hepatitis was decided prematurely. It is my view that the issues of whether the transfer of the blood was a sale or service, and whether the doctrine of implied warranty applies, are also prematurely decided in this and the DCA opinion.