Catherine Sue FISHER, Appellant,

v.

**SIBLEY MEMORIAL HOSPITAL, Appellee.**

**No. 12572.**

District of Columbia Court of Appeals.

Submitted Nov. 8, 1978.

Decided June 25, 1979.

[blank redacted block]

Edward DeV. Bunn, Baileys Crossroads, Va., was on the brief for appellant. Pamela S. Frank, Baileys Crossroads, Va., also entered an appearance.

Patrick J. Attridge, Rockville, Md., was on the brief for appellee.

Before KELLY, GALLAGHER and NEBEKER, Associate Judges.

GALLAGHER, Associate Judge:

Although sparking much debate among legal commentators,[1] the issue presented on appeal is one of first impression in this jurisdiction: the liability of a hospital for disease contracted from blood transfusions. Appellant, who sought to recover damages for personal injuries sustained when she incurred hepatitis after a transfusion of blood supplied by Sibley Memorial Hospital, lost at trial on a negligence theory. She asserts on appeal that the trial court erred, as a matter of law, in directing a verdict for the hospital on the theories of breach of implied warranty and strict liability in tort, thus withdrawing those theories from jury consideration. In our view, the judgment must be affirmed, because neither theory applies to the administering of blood transfusions by a hospital.

Appellant was admitted to Sibley Memorial Hospital (the hospital) in November 1974, following complaints of rectal bleeding. While hospitalized she received a transfusion of one unit of blood, ordered by the attending physician. Two months later, in January 1975, she was examined by her physician, who made a clinical diagnosis of hepatitis.[2]

The unit of blood administered to Miss Fisher, as a Red Cross representative testified, was collected from a volunteer donor in October 1974. At the time of donation, the blood was tested for type and group, as well as for hepatitis and syphilis contamination. The hepatitis test result was negative. The blood unit passed through the blood supply operations at Sibley Hospital and was retested for the hepatitis virus with negative results at the hospital laboratory facility. As was customary, the Red Cross charged a processing fee for the unit of blood which was paid by the hospital. Miss Fisher, in turn, was charged separately on an itemized hospital bill for blood processing and for the actual blood transfused. The charge for the blood was described as a "donor motivation fee" which was refundable if she later donated blood to the hospital.

There was conflicting expert testimony introduced at trial regarding the mode by which the hepatitis virus, Type A, is transmitted. Appellant's treating physician and an expert medical witness called by appellant at trial both testified that Type A may be transmitted by blood transfusions, although the primary means of transmission is oral, through contaminated food or water. The expert medical witness called by the defendant, a physician affiliated with the hospital, testified that the Type A virus is believed to be transmitted orally, while Type B is linked to injections with contaminated needles and transfusions of impure blood.

Both experts testified, however, that no test will detect the presence of the Type A virus in the donor's blood. The experts also agreed that an antigen test had been developed which discloses the presence of hepatitis Type B, but it is not totally accurate. Appellant's medical expert placed the test's accuracy as to Type B hepatitis at 70%, and at 35% overall accuracy as to carriers of

---

1. For a comprehensive list of articles dealing with the issue, see Comments, *Blood Transfusions and the Transmission of Serum Hepatitis: The Need for Statutory Reform*, 24 Am.U.L. Rev. 367, 369 n.7 (1975).

2. There was expert testimony at trial that the incubation period for hepatitis can be 30–60 days for Type A (infectious hepatitis) and 4–6 months for Type B (serum hepatitis). It was the belief of appellant's doctor that she had contracted Type A.

both types. According to appellee's expert, the antigen test picks up about 30% of hepatitis carriers.

After argument, the court directed a verdict for defendant on the breach of warranty and strict liability theories, but denied the motion as to the negligence count. The negligence issue was submitted to the jury which returned a verdict for the hospital.

Under D.C.Code 1973, § 28:2–314, an implied warranty of merchantability arises from a contract of sale if the seller is a merchant with respect to the goods sold. Thus, to state a valid cause of action for breach of warranty, plaintiff first must demonstrate that the giving of a blood transfusion constitutes a sale of goods carrying an implied warranty of fitness for ordinary uses. D.C.Code 1973 § 28:2–314(2)(c). In *Perlmutter v. Beth David Hospital*, 308 N.Y. 100, 123 N.E.2d 792 (1954), the first case to construe the implied warranty theory as applied to blood transfusions, the court held that plaintiff failed to state a cause of action. It reasoned that a blood transfusion could not be characterized as a product sold to the patient. Rather, the transfusion was a "service" which was part of the overall treatment that plaintiff received from the defendant hospital.

The "sales-service" dichotomy has controlled much of the hepatitis case law subsequent to *Perlmutter*.[3] Its rationale—that blood transfusions are services for which breach of warranty will not lie—was not questioned until 1966 when the Florida Supreme Court in *Community Blood Bank Inc. v. Russell*, 196 So.2d 115 (Fla.1967), carved out an exception for commercial blood banks. Although the courts of various states have recently gone different ways in the blood transfusion cases,[4] the majority are reluctant to apply traditional notions of sales law and the commercial warranty concept to nonprofit hospitals. As the Minnesota Supreme Court persuasively stated in dismissing a hepatitis victim's suit:

> We find it difficult to give literal application of principles of law designed to impose strict accountability in commercial transactions to a voluntary and charitable activity which serves a humane and public health purpose. The activities involved in the transfusion of whole blood, a component of the living body, from one human being to another may be characterized as sui generis in that the sequence of events involve acts common to legal concepts of both a sale and a service. Moreover, it seems to us that under the facts in the case before us it would be unrealistic to hold that there is an implied warranty as to qualities of fitness of human blood on which no medical or scientific information can be acquired and in respect to which plaintiff's physician has the same information, knowledge, and experience as the supplier. [*Balkowitsch v. Minneapolis War Memorial Blood Bank, Inc.*, 270 Minn. 151, 132 N.W.2d 805, 811 (1965).]

*Balkowitsch v. Minneapolis War Memorial Blood Bank, Inc.*, 270 Minn. 151, 132 N.W.2d 805 (1965); *Dibblee v. Dr. W. H. Groves Latter-Day Saints Hospital*, 12 Utah 2d 241, 364 P.2d 1085 (1961); *Gile v. Kennewick Public Hospital District*, 48 Wash.2d 774, 296 P.2d 662 (1956); *Koenig v. Milwaukee Blood Center, Inc.*, 23 Wis.2d 324, 127 N.W.2d 50 (1964). *Contra, Hoder v. Sayet*, 196 So.2d 205 (Fla.Dist.Ct.App. 1967) (breach of warranty action permitted against blood bank, but not hospital); *Jackson v. Muhlenberg Hospital*, 96 N.J.Super. 314, 232 A.2d 879 (1967), *rev'd on other grounds*, 53 N.J. 138, 249 A.2d 65 (1969); *Carter v. Inter-Faith Hospital*, 60 Misc.2d 733, 304 N.Y.S.2d 97 (Sup. Ct.1969); *Hoffman v. Misericordia Hospital*, 439 Pa. 501, 267 A.2d 867 (1970).

---

**3.** Approximately forty-four states have enacted statutes precluding liability in blood procurement cases, many by characterizing blood transfusions as services. *See Blood Transfusions*, 24 Am.U.L.Rev., *supra* at 403–08.

**4.** For cases holding blood transfusion a service, or rejecting sales analogy, and denying recovery on breach of warranty theory, *see, e. g., Sloneker v. St. Joseph's Hospital*, 233 F.Supp. 105 (D.Colo.1964); *Whitehurst v. American National Red Cross*, 1 Ariz.App. 326, 402 P.2d 584 (1965); *White v. Sarasota County Public Hospital Bd.*, 206 So.2d 19 (Fla.App.), *cert. denied*, 211 So.2d 215 (Fla.1968); *Parr v. Palmyra Park Hospital, Inc.*, 139 Ga.App. 457, 228 S.E.2d 596 (1976); *Lovett v. Emory University, Inc.*, 116 Ga.App. 277, 156 S.E.2d 923 (1967);

■ We agree with those courts which hold that the furnishing of blood is more in the nature of a service than of a sale of goods. Treating blood transfusions as an incidental service performed by hospitals comports with reality, and with the policies underlying merchantability liability. Although theoretically a seller's inability to discover defects in the goods he sells is not relevant to a warranty cause of action,[5] we cannot ignore the difficulty of detecting hepatitis in blood given the current state of medical knowledge.[6] To characterize as a sale the supplying of blood would mean that the hospital, no matter how careful, would be held responsible, virtually as an insurer, if the patient were harmed as a result of impure blood. After balancing the safety of the individual with the interests of the hospital (in light of the absence of an adequate test to determine the presence of hepatitis in the blood) and the public interest in assuring the ready availability of blood for medical treatments, we are reluctant to extend § 2–314 merchantability liability to a nonsale transaction by analogy[7] or by characterizing the transaction as a sale.

■ Because we view actions for breach of warranty and strict liability in tort[8] as being expressions of a single basic public policy as to liability for defective products, it would be inconsistent to hold that the doctrine of strict tort liability applies to blood transfusions while rejecting plain-

tiff's breach of warranty claim. As this court has stated, "the current doctrines of implied warranty and strict liability in tort are but two labels for the same legal right and remedy, as the governing principles are identical." *Cottom v. McGuire Funeral Service, Inc.,* D.C.App., 262 A.2d 807, 808 (1970).

Several state courts recently have imposed strict tort liability upon blood suppliers,[9] most notably Illinois in *Cunningham v. MacNeal Memorial Hospital,* 47 Ill.2d 443, 226 N.E.2d 897 (1970). The *Cunningham* approach has been criticized by other state courts, however, on the ground that the decision forecloses a balancing of dangers and benefits, making blood products vulnerable to strict liability without regard to social benefits. *See, e. g., Hines v. St. Joseph's Hospital,* 86 N.M. 763, 527 P.2d 1075 (1974). Other courts have refused to label blood products "unreasonably dangerous" within the meaning of Restatement (Second) of Torts § 402A (1965), because the scientific inability to screen all carriers of viral hepatitis despite due care makes blood an unavoidably unsafe product. *See Brody v. Overlook Hospital,* 127 N.J.Super. 331, 317 A.2d 392, *aff'd,* 66 N.J. 448, 332 A.2d 596 (1974); *Hines, supra; McMichael v. American Red Cross,* 532 S.W.2d 7 (Ky.App. 1975). In *Heirs of Fruge v. Blood Services,* 506 F.2d 841 (5th Cir. 1975), the court found inapplicable to blood transfusions the rationale favoring the imposition of strict tort

5. *See generally* J. J. White & R. S. Summers, Handbook of the Law Under the Uniform Commercial Code § 9–6, at 288 (1972).

6. *See, e. g., Best Tests Said to Spot Only 30% of Hepatitis B Blood,* Clinical Forum, cited in 24 Am.U.L.Rev., *supra* at 374 n. 23.

7. The Pennsylvania Supreme Court recently did so in *Hoffman v. Misericordia Hospital, supra.* The Pennsylvania court did not feel obligated to hinge any resolution on the technical existence of a sale, relying instead on case law implying warranties in nonsales transactions. This approach is consistent with UCC § 2–313, Comment (2), which indicates that the warranty sections were not intended to disturb case law recognizing that warranties need not be confined to sales contracts.

8. In *Cottom v. McGuire Funeral Service, Inc.,* D.C.App., 262 A.2d 807, 809 (1970), *subsequent appeal,* 284 A.2d 50 (1971), this court did not actually adopt "the theory of strict liability in tort with all its implications." It was not necessary to decision. Nonetheless, this jurisdiction imposes liability for injury caused by placing a defective product on the market. *See Cottom, supra* at 809; *McCrossin v. Hicks Chevrolet, Inc.,* D.C.App., 248 A.2d 917, 920 (1969). *See also Stewart v. Ford Motor Co.,* 179 U.S.App.D.C. 396, 403, 553 F.2d 130, 137 (1977).

9. *See also Hoffman, supra; Schmaltz v. St. Luke's Hospital,* 33 Colo.App. 351, 521 P.2d 787 (1974).

liability [10] (*e. g.,* one who solicits and invites use of his product by advertising, representing it to be safe, ought to be held liable for injury to the person induced to purchase it), because blood products are unavoidably dangerous and the patient relies on the skill of his physician, rather than the supplier's representations.

Significantly, Comment K to § 402A provides an exception to strict liability for products, drugs in particular, which in the present state of human knowledge, are incapable of being made safe for their intended and ordinary use (*i. e.,* rabies vaccine), but where existing medical experience justifies the marketing and use of the product despite the risk. Restatement (Second) of Torts, *supra* at 353–54. Although the *Cunningham* court characterized blood containing hepatitis as impure and defective, and thus distinguishable from a rabies vaccine which poses an inherent danger even when properly prepared, we find such a reading of § 402A's underlying policies unnecessarily cramped. As the court in *Hines, supra,* stated 527 P.2d at 1077, "the *Cunningham* court, by categorically limiting the applicability of the exception to 'pure' products stultified the flexible policy behind the exception."

In light of the underlying policies of products liability law, characterizing blood plasma as a product governed by strict tort liability is as unnatural as forcing a blood transfusion into the commercial sales mold. The policy rationale for imposing strict liability upon beauty parlors, see *Newmark v. Gimbel's, Inc.,* 54 N.J. 585, 258 A.2d 697 (1969) (Article Two warranty provisions do apply to beauty treatments), or upon lessors of personal property, see *Cintrone v. Hertz Truck Leasing and Rental Service,* 45 N.J.

434, 212 A.2d 769 (1965), differs significantly from the policy considerations in a non-commercial context such as a hospital where the supplying of blood is subordinate to the main object of health care and treatment.

Accordingly, the directed verdict for defendant-hospital was correctly granted and the judgment is

*Affirmed.*

KELLY, Associate Judge, concurring:

While I concur in the result reached in this case, I think it important to note that in my judgment this court adopted the § 402A theory of strict liability in tort in *Berman v. Watergate West, Inc.,* D.C.App., 391 A.2d 1351 (1978).

---

10. *See* Restatement (Second) of Torts, *supra,* § 402A, Comment (c) at 349–50:

The justification for the strict liability has been said to be that the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has the right to and does expect, in the case of products which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods; that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who market the products.